# United States Court of Appeals
## For the First Circuit

No. 07-1208

DAVID R. GEIGER,

Plaintiff, Appellant,

v.

FOLEY HOAG LLP RETIREMENT PLAN, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lipez, Circuit Judge,

Cyr, Senior Circuit Judge,

and Howard, Circuit Judge.

David R. Geiger, pro se.
Ann Wagner, with whom Frances M. Giordano and Rubin and Rudman, LLP were on brief, for appellee.

March 27, 2008

**HOWARD, <u>Circuit Judge</u>**. The genesis of this appeal is a contentious Massachusetts divorce. As part of the distribution of marital property, a state court judge assigned a portion of David Geiger's interest in three retirement plans to his (now ex) wife, Karen Leeds. In addition to exhausting his state court appeals of the divorce order, Geiger filed suit in federal court against the retirement plans and their administrator,[1] seeking to permanently enjoin the plans from transferring Geiger's interests to Leeds. After Leeds successfully moved to intervene in the suit, she filed a motion to dismiss, which the district court granted pursuant to the <u>Rooker-Feldman</u> doctrine. On appeal, Geiger contends that the district court first erroneously allowed Leeds's intervention, and then incorrectly granted the motion to dismiss. We affirm, albeit for reasons different than those cited by the district court.

## I. FACTUAL BACKGROUND AND PRIOR PROCEEDINGS

At the heart of this legal battle are the orders addressing Geiger's retirement accounts. Geiger claims that those orders are not Qualified Domestic Relations Orders ("QDROs") and are

---

[1] The original defendants were Foley Hoag LLP Retirement Plan, Foley Hoag LLP Savings and Retirement Plan, and Foley Hoag LLP Money Purchase Pension Plan (collectively, "the plans"). Foley Hoag is also named separately as the plans' administrator. They remained as defendants after Leeds's intervention. Geiger, appearing pro se in this action, is a litigation partner at the Foley Hoag law firm in Boston. For ease of reference we will refer to the firm as "Foley."

thus subject to ERISA's[2] anti-alienation provisions. 29 U.S.C. § 1056(d)(3). This claim is predicated on his assertion that the federal courts have exclusive jurisdiction to determine whether the orders at issue are QDROs. As our substantive analysis necessarily involves the sequence of events leading up to the orders in question, we first detail the largely undisputed trail of the case.

Geiger and Leeds were married in 1980. Following a trial, a divorce judgment was entered in June 2004. In dividing marital assets, the judge assigned Leeds benefits in three of Geiger's retirement plans. After entry of the divorce judgment, counsel for Leeds and the plans' administrators[3] worked to effectuate the transfer of the retirement plans' benefits by drafting QDROs. This step is a crucial one, as benefits provided under an ERISA plan "may not be assigned or alienated" by a domestic relations order, unless the order "is determined to be a" QDRO. 29 U.S.C. § 1056(d)(1) and (3)(A). See Barrs v. Lockheed Martin Corp., 287 F.3d 202, 208-09 (1st Cir. 2002). In December 2004, Leeds obtained model QDROs and QDRO procedures from plan administrators, and numerous rounds of back-and-forth correspondence ensued. The record reflects that Geiger was copied on all correspondence between Leeds and the plans.

---

[2]The Employee Retirement and Security Act of 1974, 29 U.S.C. § 1001 et seq.

[3]During this time frame, a separate administrator had been designated to manage two of the plans.

Proposed QDROs were presented to the divorce court[4] in January 2005.  In response to concerns raised by the judge, additional revisions were made.  Copies were provided to Geiger approximately two weeks before the next scheduled hearing.  Geiger responded a few days later.  He offered no substantive comment about the draft QDROs, but did provide Leeds's counsel with certain information she had requested about the plans.  On the day of the hearing, Geiger filed a motion objecting to the issuance of any orders relating to his retirement plans.  He alleged a host of substantive and procedural infirmities related to the divorce judgment as a whole.  Most notably, Geiger included a footnote in his motion stating that he "does not . . . address the issue of whether any order that might be issued would constitute a [QDRO].  Under ERISA, that issue is exclusively a matter of federal law for determination by the plan administrator and the federal courts."  After making several modifications to the proposed QDROs, the court entered the orders, each of which is entitled "Qualified Domestic Relations Order," and retained jurisdiction to further modify them to "establish or maintain its qualification as a [QDRO]."  Approximately three months later, after receiving correspondence from the plans' administrators that they considered the orders to be QDROs, Geiger penned lengthy letters to the administrators objecting to their conclusions.  In September 2005, the plans

[4]The Norfolk County Probate and Family Court.

rejected Geiger's objections and issued their final determinations that the court's orders were QDROs, and set out to effectuate the orders by establishing accounts for Leeds. Days later, Geiger commenced the instant action against one of the plans, essentially claiming that any transfer of his interests would violate ERISA because the orders were not QDROs. Soon after, he filed an Amended Complaint and ex parte Request for Preliminary Injunction, along with a proposed order.[5] The district court granted the injunction request in October, premising its decision, at least in part, on Geiger's incorrect assertion that the defendant plans did not object. The court did not adopt Geiger's proposed order, however. Instead, it ordered Geiger to confer with Foley to create an agreed-upon order. Such discussions never occurred. In fact, as Foley later pointed out, the defendants had not been served with the injunction request, and did not agree with Geiger's proposed order.[6] Moreover, Foley claimed that it did not even learn that Geiger's request for preliminary injunction had been granted until

_____

[5]The original complaint came in response to the final determination of one of the plans. The amended complaint was filed after the other two plans made their final QDRO determinations.

[6]Foley was made aware of the original complaint in September but not the later request for preliminary relief. Upon learning of the complaint, Foley felt bound by 29 U.S.C. § (d)(3)(H)(I) from allowing Leeds to withdraw any funds allocated to her in the divorce action. Foley, however, did set up separate accounts for Leeds to comply with its obligation to account for funds that would have gone to Leeds had the divorce orders been qualified.

December, when they were informed by Leeds's counsel. In the end, Geiger did not effect service upon Foley until January.

As these events were taking place in the federal court, Foley was also defending itself against contempt charges in the state court for not complying with the putative QDROs. Believing itself to be "stuck in the middle," Foley responded to the January service of process not by answering or seeking dismissal, but by submitting a motion for entry of a proposed order in April 2006, ostensibly seeking to have the court ratify the actions Foley took the previous September, when it learned of the original complaint. Geiger objected, due to differences between the two proposed orders, and the court scheduled a hearing for June.[7] Two weeks prior to the scheduled hearing, Leeds filed a motion to intervene, pursuant to Fed. R. Civ. P. 24(a). She simultaneously filed a motion to dismiss, invoking Rules 12(b)(1) and 12(b)(6), the Rooker-Feldman doctrine, abstention and claim preclusion. Over Geiger's objection, the court granted, without a written order, the motion to intervene. The court subsequently granted the motion to dismiss, relying on Rooker-Feldman. This appeal followed.[8]

---

[7]We would ordinarily not recount the jousting over a proposed order, but the lengthy course of events is relevant to our discussion of Leeds's intervention.

[8]At the same time Geiger was pursuing his federal case, he was also prosecuting his appeal of the divorce judgment in state court. His appeal, which raised 17 issues ranging from disqualification of the trial judge to the award of his retirement interests, was rejected by the intermediate appellate court in October 2006 via a 32-page

-6-

## II. LEGAL DISCUSSION

### A. Motion to Intervene

Leeds sought intervention "as of right," pursuant to Fed. R. Civ. P. 24(a), which provides that the court must permit intervention where her motion satisfies the following criteria: (1) the party must claim an interest in the property; (2) disposition of the case without intervention, would, "as a practical matter, impair or impede [the party's] ability to protect that interest"; (3) the party's interest is inadequately represented by the existing parties; and (4) the motion for intervention is timely made. Travelers Indem. Co. v. Dingwell, 884 F.2d 629, 637 (1st Cir. 1989).

Our standard of review on appeal is for abuse of discretion. Daggett v. Comm'n on Governmental Ethics and Election Practices, 172 F.3d 104, 109 (1st Cir. 1999). Where, as here, the district court made no specific findings, we can do so, relying on the record. Banco Popular de Puerto Rico v. Greenblatt, 964 F.2d 1227, 1230 (1st Cir. 1992).

Geiger first argues that Leeds's motion was untimely. We disagree. Initially, we note that the case had not progressed beyond the initial stages when the motion was filed. See id. at

opinion. T.C. v. J.L, 2006 WL 3019223 (Mass. App. Ct. Oct. 24, 2006). Further review was denied by the Supreme Judicial Court, T.C. v. J.L., 861 N.E.2d 29 (2007) (the court used fictitious initials for the parties to preserve a previously issued confidentiality order).

-7-

1231 ("The more advanced the litigation, the more . . . scrutiny the motion must withstand.")  Here, no action beyond the filing of the Amended Complaint had occurred.  Despite the fact the court granted Geiger's motion for preliminary injunction, he took no action to effectuate it, not even serving Foley until January.  Nor did he press for an Answer after the expiration of 20 days from service.  See Fed. R. Civ. P. 12(a).  Indeed, at the time of the motion to intervene, the only pending item was a scheduled hearing in which the court would consider the two competing injunction proposals.  In the absence of any discovery or substantive legal progress, we cannot say the litigation was in any way at an "advanced stage."  In addition to the progress of the case, a timeliness determination turns on other factors:  1) the length of time the intervenor knew her interest was imperiled; 2) the foreseeable prejudice to the existing parties if intervention is granted, or to the intervenor if it is denied; and 3) any "idiosyncratic circumstances" which weigh for or against intervention.  Banco Popular, 964 F.2d at 1230.  Here, although Leeds was aware of the lawsuit for approximately nine months before seeking intervention, we agree with Leeds that it was not until Foley declined to answer the complaint but instead sought an order that would effectively prevent its near-term compliance with the divorce judgment that she became aware that her interests were imperiled.  Until that time, she had reasonably thought that Foley

would aggressively defend the position it took in the divorce proceeding – that the orders were QDROs.[9]  Next, we find the balance of prejudices to weigh heavily in favor of Leeds.  Under either Geiger's or Foley's proposed injunctions, transfer of the plans' interests to Leeds would be indefinitely delayed.  Given that the state appeals court affirmed the award of the interest in the plans "to address the disparity in the amount of the equity in the home awarded to each party and to . . . leave both parties with relatively equivalent assets and resources," T.C. v. J.L., 2006 WL 3019223 at *6, the prejudice to Leeds is readily apparent.  On the other hand, Geiger's claim that he was prejudiced by further delay that would deny him the injunctive relief he had already achieved is belied by his own failure to serve any process upon Foley for nearly four months or to confer with Foley regarding an agreed-upon order.

We need not dwell long on Geiger's remaining arguments against intervention.  First, he argues that an "idiosyncratic factor" in his favor was that he was "an overburdened and insolvent single parent pro se litigant with no ERISA expertise . . . ."  Our review of the record, including the divorce judgment, demonstrates anything but insolvency.  In addition, we note that both the state trial and appeals courts made note of Geiger's "scorched earth"

---

[9]We are in no way suggesting that Foley's actions were inappropriate.

approach to litigation. Thus, we decline to find that this factor weighs in Geiger's favor. Finally, Geiger argues that Foley was adequately protecting Leeds's interest. This argument is devoid of merit. At the time intervention was sought, Foley had done nothing to defend its QDRO determination, and, at the same time, was essentially agreeing to an injunction, although in a different form than one proposed by Geiger. Given Foley's admission that it felt "caught in the middle" of the state court contempt action and the federal court action, it seems beyond cavil that Foley was attempting to "avoid taking sides," and was not protecting Leeds's interests.

As the record amply demonstrates that Leeds satisfied the requirements of Rule 24(a), we find that the district court did not abuse its discretion when it allowed her to intervene.

B. Motion to Dismiss

As previously noted, the district court based its dismissal on the Rooker-Feldman doctrine, which, in broad terms, deprives the district court of subject matter jurisdiction over a final judgment of a state court. See D.C. Court of Appeals v. Feldman, 460 U.S. 462 (1983); Rooker v. Fid. Trust Co., 263 U.S. 413 (1923). Importantly, however, the Supreme Court has held that the doctrine only applies to cases where the "losing party in state court filed suit in federal court after the state proceedings ended." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S.

280, 291 (2005). Parallel litigation does not trigger Rooker-Feldman. Id. at 292. The district court treated the state court litigation as concluded with respect to the QDRO issue, because Geiger did not explicitly appeal that question. However, had Geiger's appeal of the divorce judgment been successful, the orders assigning the plan benefits -- whether qualified or not -- could have been overturned. Thus, it is not at all clear to us that the state court proceedings with respect to the QDROs had ended prior to Geiger's commencement of the federal suit. Accordingly, we do not rely on the district court's Rooker-Feldman rationale.

Our inquiry does not end there, however, as we can affirm the district court's order on "any independent ground made manifest by the record." InterGen N.V. v. Grina, 344 F.3d 134, 141 (1st Cir. 2003). We choose that path here. Both before the district court and again on appeal, Leeds posited an alternative argument that res judicata and adherence to the full faith and credit doctrine require dismissal. We agree.

A federal court must give a state court judgment "'the same preclusive effect as would be given that judgment under the law of the state in which the judgment was entered.'" Torromeo v. Town of Fremont, 438 F.3d 113, 115-116 (1st Cir. 2006) (quoting Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984)). That a suit raises a federal question does not alter this

calculus.  <u>Cruz</u> v. <u>Melecio</u>, 204 F.3d 14, 18 (1st Cir. 2000)(citing <u>Migra</u>, 465 U.S. at 80-85).

Under Massachusetts law, a party will be precluded from litigating a matter that was, or could have been, adjudicated in the previous matter.  <u>Blanchette</u> v. <u>Sch. Comm. of Westwood</u>, 692 N.E.2d 21, 25 (Mass. 1998); <u>Heacock</u> v. <u>Heacock</u>, 520 N.E.2d 151, 152-53 (Mass. 1988).  This rule applies even if the litigant is prepared to present different evidence or legal theories in the second action, or seeks different remedies.  <u>Heacock</u>, 520 N.E.2d at 153.  The rule is "based on the idea that the party to be precluded has had the incentive and opportunity to litigate the matter fully in the first lawsuit."  <u>Id.</u> (internal quotes and citation omitted).

Here, Leeds argues that Geiger could have argued to the state trial or appellate courts that the orders at issue are not QDROs, and that his failure to do so, combined with the finality of the divorce judgment, is fatal to his federal suit.  Geiger responds in two ways.  First, he argues that state courts do not have jurisdiction to determine whether domestic relations orders are QDROs, and therefore he did not have an "opportunity to litigate the matter fully in the first lawsuit."  Geiger cites no cases in support of his position.  Instead he relies on what he calls the "unambiguous language" of ERISA, specifically, 29 U.S.C. § 1132(e)(1), which provides that federal courts "have exclusive jurisdiction over civil actions under this subchapter brought by a

-12-

. . . participant," with the exception that state courts have concurrent jurisdiction over actions brought to recover benefits or enforce or clarify rights under a plan. 29 U.S.C. § 1132(a)(1)(B). In Geiger's view, this is the beginning and the end of the inquiry. His view, however, has been rejected by several courts. See e.g., Scales v. Gen. Motors Corp., 275 F. Supp.2d 871, 876-77 (E.D. Mich. 2003) ("[S]tate courts have concurrent jurisdiction regarding the interpretation of QDROs . . . and are fully competent to adjudicate whether their own orders are QDROs."); In re Marriage of Oddino, 939 P.2d 1266, 1272 (Cal. 1997)(action to qualify domestic relations order is an action to "obtain or clarify benefits claimed under the terms of a plan," and thus within state courts' jurisdiction); Robson v. Elec. Contractors Ass'n Local 134, 727 N.E.2d 692, 697 (Ill. App. Ct. 1999) ("[S]tate and federal courts have concurrent subject matter jurisdiction to construe the ERISA provisions relating to a QDRO . . . ."); Eller v. Bolton, 895 A.2d 382, 393 n.6 (Md. App. 2006) ("State and federal courts have concurrent jurisdiction to review a plan's qualification of a state domestic relations order . . . .").

Geiger acknowledges the one-sidedness of the caselaw, but argues that the rationale set forth by those decisions both violates ERISA's plain language and is "logically senseless." We do not agree. In our view, it is significant that Congress has expressly exempted QDROs from ERISA's general preemption of state

-13-

law. 29 U.S.C. 1144(b)(7). We are further persuaded that, "separate litigation of the QDRO issue in federal court presents the potential for an expensive and time-consuming course of parallel litigation . . . in the two court systems." Oddino, 929 P.2d at 1274-75. And finally, we share the view of the Oddino court that:

> Congress, having given state courts the power to issue orders determining and dividing marital rights in retirement plans, would require a separate federal court proceeding to decide whether the order is a QDRO. This would cause undue hardship, expense and delay to the affected party, and impose an unnecessary workload on already overburdened federal courts.

Id. at 1272 (quoting In re Marriage of Levingston, 16 Cal.Rptr.2d 100, 102 (App. Ct. 1993)

Geiger's last attempt to avoid the finality of the Massachusetts judgment is to argue that he made a so-called "England reservation" in the state court, and thus preserved his federal claim. Pursuant to England v. La. State Bd. of Med. Exam'rs, 375 U.S. 411, 428 (1964) a plaintiff can, in some circumstances, protect a right to litigate a federal claim in federal court by "reserving the right" in the state court. As we previously noted, Geiger included a footnote in various state court filings that he was reserving what he believed to be exclusively federal claims for federal court adjudication. In the district court, however, he made no more than a passing reference to his

-14-

reservation.  Under these circumstances, we believe that Geiger has waived the England argument.  Even if preserved, however, the claim lacks merit.

In England, the Court held that a litigant sent to state court after a federal court abstention can "reserve" its right to return to federal court at the conclusion of the state court proceedings.  England, 375 U.S. at 415; see also, Fuller Co., v. Ramon I. Gil, Inc., 782 F.2d 306, 312 (1st Cir. 1996) (emphasis added).  The right to reserve claims only arises where a federal court abstains from deciding a federal issue to enable the state court to address an antecedent state law issue.[10]  San Remo Hotel, L.P. v. City and County of San Francisco, Cal., 545 U.S. 323, 339 (2005); see also, Duty Free Shop, Inc., v. Administracion De Terrenos, 889 F.2d 1181, 1183 (1st Cir. 1989).  As this case did not involve federal court abstention, we find England inapplicable.  See Griffin v. State of Rhode Island, 760 F.2d 359, 360 n.1 (noting that England does not supplant state preclusion law where state action proceeded to judgment before litigant sought adjudication of federal claim in federal court).

In the final analysis, Geiger rejected the opportunity to challenge the QDROs at both the state trial and appellate levels.  That he did so on the mistaken belief that the federal courts had

---

[10]This process is known as Pullman abstention.  See Railroad Commission of Tex. v. Pullman Co., 312 U.S. 496 (1941).

exclusive jurisdiction over those challenges does not alter the finality of those judgments, nor their preclusive effect.

The judgment of the district court is **<u>Affirmed</u>**.