**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1683**

BRIAN DAVISON,

       Plaintiff - Appellant,

    v.

DEBORAH ROSE; TRACY STEPHENS; ERIC HORNBERGER; JILL
TURGEON; BRENDA SHERIDAN; JEFFREY MORSE; WILLIAM FOX; KEVIN
KUESTERS; JOY MALONEY; ERIC DEKENIPP; SUZANNE G. DEVLIN;
LOUDOUN COUNTY SCHOOL BOARD,

       Defendants - Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria. Anthony John Trenga, Senior District Judge. (1:16-cv-00540-AJT-MSN)

Argued: September 23, 2021              Decided: December 3, 2021

Before GREGORY, Chief Judge, and KING and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Floyd wrote the opinion, in which Chief Judge
Gregory and Judge King joined.

Michael Allen Bragg, BRAGG LAW, Abingdon, Virginia, for Appellant. Julia Bougie
Judkins, BANCROFT, MCGAVIN, HORVATH & JUDKINS P.C., Fairfax, Virginia, for
Appellees.

FLOYD, Circuit Judge:

Plaintiff Brian C. Davison, the parent of children attending Seldens Elementary School (Seldens) in Loudoun County, Virginia, at times relevant to this litigation, claims that between 2015 and 2016, Defendants engaged in conduct restricting his First and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

On May 13, 2016, Davison filed this federal action. He sued the Loudoun County School Board (LCSB), various members of the LCSB, and current and former employees of the Loudoun County Public School System (LCPS), in both their official and individual capacities, for injunctive relief and monetary damages. Defendants Morse, Sheridan, Rose, Hornberger, Fox, Turgeon, Keusters, and Maloney at material times served on the LCSB. Defendant Stephens was the principal of Seldens between July 2011 and June 2016 and is now the principal of Aldie Elementary School, also in LCPS. Defendant Devlin served as the supervisor of security for LCPS between 2014 and 2019.

The district court granted Defendants' Motion to Dismiss the claims against the LCSB based on res judicata. On May 1, 2020, the district court denied all of Davison's remaining claims, except for one claim for injunctive relief against Defendant Morse concerning Davison's access to Morse's social media pages (Count 1(a)). The parties voluntarily dismissed that claim after Morse unblocked Davison on social media. Davison now appeals the district court's decisions on several claims against several Defendants. We affirm the district court's decisions on all counts.

## I.

## A.

This case arises in large part from no-trespass letters Defendants issued to Davison in 2015 that prohibited his presence on school property and attendance at any school-sponsored activities unless authorized. However, the antagonism between the parties began in 2014, when Davison sued the Virginia Department of Education (VDOE) in state court to obtain Student Growth Percentiles (SGPs) for Loudoun schools. The LCSB moved to intervene in Davison's lawsuit to prevent him from obtaining SGPs, but VDOE released all Virginia SGPs in February 2015.

Based on this SGP information and other grievances he had with the LCSB and LCPS, Davison began to publicly criticize LCPS policies in January 2015, including allegations that LCPS violated federal law, misled the public regarding budget information, and flouted Virginia's Conflict of Interest Act. Davison frequently chastised LCSB members in many forums and during public comment periods at LCSB meetings. He routinely emailed individual LCSB members and made multiple social media posts about his complaints. Davison also commented on LCSB members' Facebook and other social media platforms. LCSB members eventually voiced personal safety concerns about Davison, prompting a law enforcement officer to attend all meetings after January 20, 2015. At the time of the district court's summary judgment opinion, Davison was banned from accessing board member Morse's Twitter account. Morse has since removed the ban.

In September 2015, Davison appeared at a back-to-school night and a PTA meeting at Seldens where, according to witnesses, his behavior, conduct, tone, and demeanor

prompted multiple complaints. On September 30, 2015, Principal Stephens served Davison with a no-trespass letter,[1] which was later amended and supplemented with no-trespass letters issued on behalf of the LCSB on October 8 and October 14, 2015. The no-trespass ban prevented Davison, for the remainder of that school year, from (1) attending any public events inside Seldens that were open to the public, including PTA meetings; (2) using any outdoor public facilities, such as the track or playgrounds; and (3) dropping off or picking up his children at the school without first getting permission from Stephens. Still, Davison could attend LCSB meetings and participate in the public comment periods. The letter informed Davison that he could appeal.

The September 30 and October 8 no-trespass letters cited multiple reasons for their issuance including: (1) Davison's behavior at the back-to-school night where he interrupted both of his children's teachers to raise non-germane questions; and (2) Davison's behavior at the September 22, 2015, PTA meeting, where Davison, with an aggressive tone, accused Stephens of violating the law and students' privacy and, allegedly said to Stephens, "Try me. Try me. You'll end up in Federal Court." JA 3789. In October 2015, Davison involved his children in his efforts. His children, at his direction, distributed flyers on school property during their class time, presenting Stephens's picture and Davison's criticisms of school policies and alleged violations of federal law. This and other behavior concerned school officials about the children's welfare.

---

[1] Before issuance, the Director of School Administration reviews no-trespass letters based on content and rationale to determine whether there is a grave or significant disruption to the learning environment, school operations, or tranquility of the school.

The October 14 no-trespass letter restated the restrictions and highlighted Davison's behavior, claiming he violated the conditions of the September 29 letter and that he wrote in the emails that he considered Stephens' prior restrictions "null and void." Additionally, Stephens wrote:

> [Y]ou have stated publicly that you are a Navy veteran, publicly made allusions to American Sniper, used the term "SHOTGUN" in reference to a public meeting, referred to "BE PREPARED" regarding a public meeting, referred to a public school as a "target rich environment," used a quote that referred to a "hand grenade," made references to public officials' children, and made a reference to public officials meeting their creator [, which] have all contributed to intense fear among staff, caused disruption and time off tasks, causing great alarm and concern for the safety of Seldens Landing Elementary School. Your tone has been both aggressive and intimidating. Staff has [re]viewed your demeanor and are very concerned about your behaviors.

JA 817. The October 14 letter also provided Davison the opportunity to appeal. It further made accommodations for Davison as a parent, including quarterly telephone conferences with Stephens regarding Davison's children's progress in school.

Also in October 2015, Stephens, who was a mandatory reporter of child abuse under Virginia law, began receiving reports about Davison's children from their teachers, two other teachers, and community members, who raised concerns about the children's well-being. For example, Kathy Gims, a teacher at Seldens, declared that she saw Davison's son handing out flyers as class was starting and the boy told her that Davison told him that he had to hand out flyers. Gims told the boy to go to class and she reported the incident to Stephens. Another teacher, Lori Haskins, reported to Stephens several instances where Davison's daughter was crying or visibly upset. The husband of one of Davison's children's teachers wrote to the school district that, based on Davison's behavior towards

5

his wife, he was very concerned that Davison was mentally unstable and needed intervention: "[i]n my mind, Brian Davison is unstable, irrational, and is creating an unacceptable level of fear, concern, and anxiety at a school of 800+ students." JA 2,262. Stephens then conferred with her supervisors and counsel about her responsibilities according to the Child Protective Services (CPS) guidelines for mandatory reporters. On October 27, 2015, Stephens contacted CPS with concerns regarding Davison and his children. CPS investigated the matter and dismissed all allegations.

Davison appealed the no-trespass letters to Stephens, who denied the appeal. Davison then filed an administrative appeal, which was also denied. On December 1, 2015, Davison provided additional information to the LCSB in an appeal of the ban. That same day, the LCSB denied the appeal.

On December 22, 2015, Davison filed a Petition for Review of the no-trespass letters in the Circuit Court of Loudoun County, Virginia. *See Brian C. Davison, Petitioner v. Loudoun Cnty. Sch. Bd.*, CL00098468-00 (Va. Cir. Ct. 2015). In the Petition, Davison claimed that the no-trespass letter violated his First and Fourteenth Amendment rights. Davison later filed a Motion for Injunctive Relief, requesting that the state court enjoin the LCSB from enforcing the no-trespass letters.

After the federal lawsuit was filed, the LCSB updated its facility use policy (Policy 6310) in November 2018. Policy 6310, which is still in effect, banned any recipient of a no-trespass letter from a LCPS official from using any outdoor facilities at any time, regardless of the specifics within their individual no-trespass letter.

B.

6

Davison filed this federal suit on May 13, 2016. At the time, Davison's state court petition was still pending, so the district court stayed the federal case pending resolution of the state court petition. On August 5, 2016, the state court dismissed Davison's petition with prejudice. The district court accordingly lifted its stay on September 9, 2016, to allow Defendants to litigate their previously filed motions to dismiss. On July 28, 2017, the court dismissed Davison's Amended Complaint, holding that res judicata or qualified immunity barred each of the claims.

Davison appealed the district court's dismissal. On March 19, 2018, the Fourth Circuit remanded, concluding that the district court's order was not "final" for purposes of appellate jurisdiction because the court did not consider Davison's claims for injunctive relief. On April 19, 2019, the district court granted Defendants' renewed Motions to Dismiss Davison's claims for injunctive relief as to Defendants Rose, Stephens, Hornberger, Turgeon, Sheridan, Morse, Maloney, and Devlin and dismissed the action as moot as to Defendants Fox, Keusters, DeKenipp, and the LCSB.

On April 30, 2019, Davison filed a Motion for Reconsideration of the district court's July 28, 2017, and April 19, 2019 Orders. On July 31, 2019, the district court granted the Motion for Reconsideration and reinstated Davison's claims for injunctive relief against certain individual Defendants under Counts 1, 2, 4, 5, 6, and 7 and also Davison's claims for monetary relief against certain individual Defendants under Counts 4, 5, 7, and 8. However, the district court reaffirmed dismissal of all claims against the LCSB and the individual Defendants in their official capacities. On December 19, 2019, the district court entered the parties' joint stipulation of voluntary dismissal of all claims against Defendant

7

DeKenipp and Counts 1, 3, 4, 5, 6, and 7 against Defendants Maloney, Turgeon, Keusters, and Fox.

On May 1, 2020, the district court ultimately denied Davison's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment as to Davison's claim for injunctive relief against Defendant Morse in Count 1(a) (concerning access to his social media pages), but otherwise granted Defendants' Motion on all remaining claims. The parties voluntarily dismissed the claim for injunctive relief in Count 1(a) against Morse after he unblocked Davison on social media. Davison appeals this order, as well as the July 28, 2017, April 19, 2019, and July 31, 2019 orders.

A summary of the claims Davison appeals is as follows:

- **Count 1**: Davison appeals the district court's (1) dismissal of his First Amendment claim against the LCSB in its official capacity for injunctive relief and monetary damages because he was blocked on various social media pages and (2) denial of his First Amendment claim for monetary damages against Rose and Hornberger in their individual capacities because they allegedly censored Davison at LCSB meetings on summary judgment.
- **Count 2**: Davison appeals the district court's (1) dismissal of his First Amendment retaliation claim against the LCSB in its official capacity for injunctive and damages and (2) denial of his First Amendment retaliation claim for monetary damages against Rose, Hornberger, Stephens, Devlin, Morse, Fox, Turgeon, Kuesters, and Maloney in their individual capacities on summary judgment.
- **Counts 4 and 5**: Davison appeals the district court's decisions regarding his First Amendment free speech and assembly claims against the no-trespass ban, including (1) dismissal of his claims for injunctive relief and monetary damages against the LCSB in its official capacity and (2) denial of his claims for injunctive relief against Morse and Sheridan in their individual capacities and for monetary damages against Rose, Hornberger, Stephens, Morse, and Sheridan in their individual capacities on summary judgment.
- **Count 6**: Davison appeals the district court's (1) dismissal of his Fourteenth Amendment procedural due process claim for injunctive relief and monetary relief against LSCB and (2) denial of his claims for injunctive relief against

8

Stephens, Morse, and Sheridan on summary judgment.

## II.

This Court reviews an appeal of summary judgment de novo, "applying the same legal standards as the district court and viewing all facts and reasonable inferences therefrom in the light most favorable to the moving party." *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018) (quoting *T-Mobile Ne. LLC v. City Council of Newport News*, 674 F.3d 380, 384-85 (4th Cir. 2012). Likewise, we review de novo grants of qualified immunity, Cox *v. Quinn*, 828 F.3d 227, 235 (4th Cir. 2016), and Rule 12(b)(6) dismissals of claims, *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016). Reviewing motions to dismiss, we "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 179-80 (4th Cir. 2009).

## III.

The district court dismissed all claims against the LCSB and the individual defendants in their official capacities in Counts 1 through 7 because it found res judicata precluded those claims. Davison appeals that decision for all claims against the LCSB in Counts 1, 2, and 4-6.[2] We affirm the district court.

---

[2] Davison stated he appeals the July 31, 2019, order but the chart he provided in his brief, Op. Br. at 12, only shows that he appeals just the LCSB official-capacity claims, not the claims against individual defendants in their official capacity.

9

Under Virginia law, a valid res judicata defense requires: (1) a final judgment issued on the merits of a prior suit; (2) identity of parties—or those in privity with the parties—between the prior and present suits; and (3) that the prior proceeding arose out of the same conduct, transaction, or occurrence. *See Lee v. Spoden*, 776 S.E.2d 798, 804-06 (Va. 2015).

Under Virginia law, as a general rule, a dismissal of a claim "with prejudice" constitutes "an adjudication on the merits, and final disposition, barring the right to bring or maintain an action on the same claim or cause." *Reed v. Liverman*, 458 S.E.2d 446, 447 (Va. 1995) (citing *Black's Law Dictionary* 469 (6th ed. 1990)). Furthermore, a dismissal with prejudice generally "is as conclusive of the rights of the parties as if the suit had been prosecuted to a final disposition adverse to the plaintiff." *Id.* However, the words "with prejudice" must "be considered in light of the circumstances in which they are used." *Id.* (quoting *Va. Concrete Co. v. Bd. of Supervisors*, 197 Va. 821, 825 (Va. 1956)).

Nothing about the circumstances of this case suggests that the state court's dismissal was anything other than a resolution constituting a final adjudication on the merits. In the state court proceedings, Davison admitted there was no "justiciable controversy" remaining for the court to decide once the no-trespass letter expired and he was allowed back on LCPS grounds. He had "no reason to believe LCSB [would] issue another ban in bad faith." JA 772. Davison contended in his motion for reconsideration that the state court granted a motion for nonsuit. However, the state court did not grant Davison's motion for nonsuit. In fact, the court told Davison that it did not have the authority to enter a nonsuit and that the only option was "outright dismissal or withdrawing your appeal." JA 772 n.6. Davison then agreed to a dismissal with prejudice. JA 772; *see also* JA 772

10

n.6. Under Virginia law, this constituted a final judgment on the merits. *See Reed*, 458 S.E.2d at 447. Because Davison brings the same claims against the same party—LCSB—res judicata bars these claims. Davison then tried to bring the same claims against the LCSB in federal court.

Davison nonetheless contends that his claims should not be precluded because he properly invoked an *England* reservation in his nonsuit motion. *See England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411 (1964). In *England*, the Supreme Court held that a litigant sent to state court to address an antecedent state law issue after a federal court *Pullman* abstention can "reserve" its right to return to federal court at the conclusion of the state court proceedings. *See id.* at 415; *see also Geiger v. Foley Hoag LLP Ret. Plan*, 521 F.3d 60, 67 (1st Cir. 2008). Thus, an *England* reservation only applies after a federal court abstains under *Pullman*. *San Remo Hotel, L.P. v. City & Cnty. of San Francisco*, 545 U.S. 323, 339 (2005); *see also Geiger*, 521 F.3d at 67 & n.10 ("[Under *Pullman* abstention,] [t]he right to reserve claims *only* arises where a federal court abstains from deciding a federal issue to address an antecedent state law issue." (emphasis added)). This case does not involve a *Pullman* abstention. Davison did not go to state court because a federal court sent him there to decide an antecedent state law issue. Instead, Davison went to state court in the first instance, on his own volition, and voluntarily dismissed his Petition with prejudice. While there might be some language in Davison's state court motion to nonsuit where he attempted to reserve his claims, *see* JA 698 ("[c]onstitutional claims are appropriately adjudicated in federal courts"), Davison never mentioned his pending action in the hearing on his motion, and he never informed the state court that he was dismissing

11

his petition to pursue his federal action. Davison subsequently agreed to dismiss his state petition, which included federal claims, with prejudice, despite being given the opportunity to withdraw his petition. *See* JA 772; *see also* JA 772 n.6. He cannot now make an *England* reservation argument.

We thus affirm the district court's dismissal of the claims against the LSCB under settled res judicata principles.

## IV.

The only remaining claims in Count One are for monetary damages against Rose and Hornberger in their individual capacities for alleged censorship of Davison's speech at the LCSB's meetings.[3]

First Amendment claims like these proceed in three steps. First, the Court determines whether the "speech [was] protected by the First Amendment. . . ." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). Next, the Court "must identify the nature of the forum" in which the speaker spoke. *Id.* Finally, the Court must ask "whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Id.*

All parties agree that the school board meetings were limited public fora. *See Steinburg*, 527 F.3d at 385. "The standards that we apply to determine whether a State has

---

[3] At the summary judgment stage, this claim was also against Morse, but according to Davison's chart of his appeals, *see* Op. Br. at 12, he is not appealing the claim against Morse.

12

unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001). Government entities may create a limited public forum in a specified location for a limited use, so long as they do not impose those limits in a manner that discriminates based on the speaker's viewpoint. *Steinburg v. Chesterfield Cnty. Plan. Comm'n*, 527 F.3d 377, 384-85 (4th Cir. 2008). Thus, "when the State establishes a limited public forum, the State is not required to and does not allow persons to engage in every type of speech. The State may be justified 'in reserving its forum for certain groups or for the discussion of certain topics.'" *Good News Club*, 533 U.S. at 106 (cleaned up) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Even in a limited public forum, however, the government "'must not discriminate against speech on the basis of viewpoint,' and any restriction 'must be reasonable in light of the purpose served by the forum.'" *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067-68 (4th Cir. 2006) (quoting *Good News Club*, 533 U.S. at 106-07).

Since the school board meetings are limited public fora, the LCSB is "justified in limiting its meeting to discussion of specified agenda items and in imposing reasonable restrictions . . . to further the forum's purpose of conducting public business." *Steinburg*, 527 F.3d at 385. The LCSB has a policy, § 2-29, that regulates the public's participation at school board meetings. That policy, in relevant part, limits the content of public comments to matters related to the public schools and does not allow comments "that are harassing or amount to a personal attack against any identifiable individual," including school board members. JA 31. The policy states that it limits public comment in this way

13

in order "to maximize citizen participation and to allow the Board to transact public business in an orderly, effective, efficient and dignified manner." JA 31. Personal attacks are thus prohibited because they have the "potential for causing unnecessary delay or disruption." JA 31.

We uphold this policy. In *Steinburg*, we upheld a similar policy against personal attacks in a limited public forum "as necessary to further the forum's purpose of conducting good business." 527 F.3d at 387. LCSB's policy, like the one in *Steinburg*, is a constitutional policy for a limited public forum because it is viewpoint neutral, and the restriction is reasonable in light of the purpose of the LCSB. The policy prohibits all personal attacks, regardless of viewpoint, because they cause "unnecessary delay or disruption to a meeting." JA 31. The policy is reasonable in light of the purpose served by the forum. Like in *Steinburg*, the LCSB is justified in imposing these restrictions as they are reasonable "to further the forum's purpose of good business." 527 F.3d at 385.

Davison asserts the policy was not used in a viewpoint-neutral way towards his speech. In his brief on appeal, Davison identifies five instances "in which his on-topic, critical comments of LCSB member actions were materially interrupted by Rose or Hornberger," which he asserts constitutes viewpoint discrimination. Op. Br. at 41. In all five videos, Davison is interrupted and warned for talking about particular board members, discussing their children, and providing comments that were not about the topic of the meeting. Davison was warned about violating § 2-29 and was only asked to yield the floor once, when he tried to talk about individual board members in a public hearing about the elementary zoning process and never seemed to address the designated topic of the hearing.

14

Indeed, in one of the five videos, Davison was allowed to speak uninterrupted, despite mentioning individual board members, when his comments focused on the topic of the board meeting.

Davison also provides comparison videos of other members of the public providing public comments where they are not interrupted, which he asserts shows he suffered viewpoint discrimination. While it is true that some of the speakers were very animated and several used explicit words, none of the speakers made comments about individual board members. All of their comments were about school-related topics pertaining to "diverse culture books," and the explicit words were from book quotations.

The restrictions are also reasonable in regard to Davison's speech. In the videos Davison identified to support his argument, the LCSB members are not going beyond the bounds of the policy to interrupt his speech. Per the policy, the LCSB members warn Davison that his personal attacks are out of order, but he is allowed to continue speaking.

For the same reasons, Davison has alternative means of communication to express his ideas about the LCSB members. Davison has submitted evidence showing he has spoken at the LCSB many times. As the Court stated in *Steinburg*, "denying a speaker at the podium in a Commission hearing the right to launch personal attacks does not interfere with what that speaker could say without employing such attacks." 527 F.3d at 387 (internal quotations omitted).

Accordingly, Rose's and Hornberger's decision to restrict Davison's speech at LCSB meetings did not violate his right of free speech and the district court should be affirmed.

V.

Davison asserts that the Defendants engaged in First Amendment retaliation by issuing the no-trespass letters, engaging in other speech-chilling activities in response to his comments about school board members, and contacting CPS about the welfare of his children.

A plaintiff claiming First Amendment retaliation must demonstrate that: "(1) [he] engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendants' conduct." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (citing *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000). The district court denied all elements of Davison's retaliation claim. We affirm.

A.

The district court held that Davison "has not as a matter of law made an adequate showing of a causal relationship between his protected speech and Defendants' decision to issue the no-trespass letter." JA 3823. Davison asserts that the court did not properly weigh facts in his favor, pointing to the no-trespass letters which in part cite Davison's criticisms of LCPS staff. While criticisms of staff are surely protected speech, Davison omits the other stated reasons in the no-trespass bans. In particular, Stephens wrote in the last no-trespass ban letter that Davison had "made allusions to American Sniper," said "SHOTGUN" and "BE PREPARED" in reference to public meetings, called a public school a "target rich environment," and "made a reference to public officials meeting their

16

creator," among other concerning statements. JA 817. Davison has not sufficiently provided evidence to prove that the no-trespass ban was issued because of his protected speech, as opposed to his threats and antagonistic behavior. *See Wood v. Arnold*, 321 F. Supp. 3d 565, 581 (D. Md. 2018) (finding that "[t]he record indicates that Defendants issued the No Trespass Order based on their perception of the threats of disruption following notification of Mr. Wood's Facebook posts, not in objection to Mr. Wood's protected speech" where the plaintiff posted on social media messages that were perceived as threats), *aff'd*, 915 F.3d 308 (4th Cir. 2019). Thus, the district court correctly determined that Davison did not experience retaliation.

Davison also asserts that the LCSB censorship of his speech at school board meetings was retaliation. As discussed above, Defendants did not unlawfully curtail Davison's speech in the school board meetings. The district court's denial of these grounds of count two was not in error and is affirmed.

## B.

Davison's contention that Stephens retaliated against him by contacting CPS on October 27, 2015 is a closer issue.[4] As we have recognized, there is the possibility of serious consequences for parents who were reported due to the mistaken suspicion of child

---

[4] We note that Davison brings a First Amendment retaliation claim regarding Stephens' contacting CPS for the first time on appeal. In his complaint, Davison did not discuss the CPS issue as part of his retaliation claim. He raised the CPS issue as part of his state law defamation claim in Count 8, but does not appeal the district court's denial of his claims on summary judgment.

abuse. *See Wolf v. Fauquier Cnty. Bd. of Supervisors*, 555 F.3d 311, 314 (4th Cir. 2009). However, we have also recognized that Virginia has designed its child abuse mandatory reporting system in a way that prioritizes the protection of children over the potential costs of a mistaken report. *Id.* The district court granted summary judgment for the Defendants on this element of count 2 and we affirm.

It is undisputed that, at the time of the CPS report, Stephens was a mandatory reporter of child abuse under Virginia law. Under Virginia Code § 63.2-1509, teachers, as well as a number of other occupation holders, who "have reason to suspect that a child is an abused or neglected child, *shall* report the matter immediately to the local department of the county or city wherein the child resides or wherein the abuse or neglect is believed to have occurred or to the Department's toll-free child abuse and neglect hotline." Va. Code Ann. § 63.2-1509 (emphasis added). Mandatory reporters who fail to notify the authorities are subject to fines. *Id.* As this Court has recognized, "[u]nder Virginia law, reporters are protected." *Wolf*, 555 F.3d at 317. A person who reports suspected child abuse pursuant to § 63.2-1509 "shall be immune from any civil or criminal liability in connection therewith, unless it is proven that such person acted in bad faith or with malicious intent." Va. Code Ann. § 63.2-1512. Thus, the "statutory framework is designed to encourage those who genuinely suspect a child is at risk to report their suspicions to authorities without fear of civil liability." *Wolf*, 555 F.3d at 317. This Court has explained that Virginia's child protection framework establishes a "strong presumption that immunity applies." *Id.* at 318. This presumption "cannot be overcome '*unless it is proven* that [the reporter] acted in bad faith or with malicious intent." *Id.* at 318 (quoting Va. Code Ann.

18

§ 63.2-1512). "The burden is placed squarely on the person who would overcome the presumption to prove that immunity should not attach." *Id.*

"In short, the Virginia General Assembly set a high bar for those wishing to strip reporters of suspected child abuse of their statutory immunity," as evidenced by the requirements of "malicious intent" or "bad faith." *Id.* "So long as the reporter was acting in the interest of protecting a child rather than out of self-interest or with an intent, for example, to settle some score with the child's parent, the plain intent of the legislature was to allow immunity to attach to the reporter." *Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Floyd*, 235 Va. 136, 144 (Va. 1988)).

Davison fails to overcome the presumption that Stephens possesses immunity as a mandatory reporter. He offers only conclusory suppositions that "Stephens frivolously referred Davison to CPS," Op. Br. at 34, and "Stephens conspired with senior LCPS officials to refer Davison to CPS for child abuse," Op. Br. at 5, without any supporting facts. Davison provides that Stephens possibly issued the referral to CPS based on a frivolous reason—that Davison sent his child to school in rain boots, which made it so she could not play kickball with her class.

However, Davison's arguments obfuscate other key facts regarding Stephens's actions. Davison ignores that Stephens made the referral after several teachers—none of whom are defendants in this action—came to her with concerns about Davison's children. JA 3,486. Teachers reported the children crying about having to hand out fliers, during class time, that Davison made and instructed them to distribute. Stephens testified in her deposition that she was alerted to a "series of instances . . . where a teacher would see the

19

children acting differently than they would typically." JA 3,486. Further, "there were some situations where [Davison's daughter] would come to school without her lunch, without her homework, dressed not for the weather . . ." and that "we could just see changes in [the children's] demeanor and [see them] withdrawing." JA 3,487. Stephens further testified that she consulted with her supervisor and made the report "because I'm required to make a report" and "also [because] seeing Mr. Davison's demeanor, [I was] just concerned for his ability to care for the kids, when we could see that his state of mind seemed highly agitated. He seemed angry and aggressive toward people . . ." JA 3,487-88.

The record reflects that Stephens reached out to school officials about what her responsibilities were for reporting Davison to CPS. *See* JA 2,930-33. The guidance emails Stephens received include CPS's Guide for Mandated Reporters which states "[m]ental abuse or mental neglect may result from caretaker behavior, which is rejecting, chaotic, bizarre, violent, or hostile." JA 2,930. Stephens thus tried to obtain the necessary advice and information before submitting the complaint and she believed it was her responsibility under the law. Davison argues that this decision was made in retaliation for his speech and that the only evidence Stephens had was the incident in which his daughter wore rainboots, but the CPS referral itself never mentions the rainboots and focuses more broadly on Davison's "increasingly irrational behavior." JA 3,687. It also mentions that his children were "coerced and/or forced . . . to distribute" flyers "including on rainy days," and that Davison "attempted to gain access to the school on at least 3 occasions by sending the children to school without lunch, snack and materials." JA 3,687. Davison has not shown,

20

in light of these facts, that Stephens's referral to CPS was done in bad faith or with malicious intent.

Davison has failed to overcome the strong presumption that Stephens is entitled immunity as a mandatory reporter. Like in *Wolf*, "[w]e affirm the judgment for defendants because the Commonwealth of Virginia has made the protection of children the centerpiece of its child abuse reporting systems and its social services apparatus. To impose civil liability in these circumstances would turn that system on its head." 555 F.3d at 314. In *Wolf*, an employee of a licensed counseling center reported suspected child abuse to the Department of Social Services, a report that was later characterized by this Court as a "false positive." *Id.* at 324. The mother of the children filed suit against the employee and other defendants, claiming violations of various state law torts, as well as claims under 42 U.S.C. § 1983. This Court treated the employee, for the sake of argument, as a voluntary reporter, but found that Virginia law protects mandatory and voluntary reporters. We found that the employee was protected from suit as a reporter. *Id.*

As we have previously stated,

> Hard choices surround the issue of suspected child abuse. Virginia's reporting statute and its social services apparatus are both based on the assumption that false positives—mistaken reports of child abuse followed by DSS investigations—are less harmful than false negatives—serious harm to a child that could have been prevented but was not. . . . There is no conceivable child abuse prevention policy that both gives government the ability to respond to threats in order to prevent harms before they occur yet prevents government from investigating before being certain that a perceived threat is real. Policymakers must choose which of these harms is the greater evil.

> This case makes concrete the consequences of a false positive . . . But because the Commonwealth of Virginia in designing its child abuse reporting

21

scheme and its social services apparatus decided the costs of an occasional mistaken report were far less than the costs of lasting harm to the lives and safety of young children, the judgment must be affirmed.

*Id.* at 323-324. As in *Wolf*, this report turned out to be a false positive as subsequent investigation revealed that CPS was not concerned with Davison's interactions with his children. However, Stephens is still entitled to a strong presumption of immunity and Davison has not overcome that presumption. Davison has not provided much beyond legal conclusions to support his argument and he has not shown evidence of bad faith or malice. Thus, we affirm on this element of count two.

## VI.

Davison appeals the district court's grant of summary judgment for the Defendants on Counts 4 and 5 claims—that the no-trespass ban violated his First Amendment Free Speech and Assembly rights—for monetary damages and injunctive relief, on both the merits and due to the Defendants' qualified immunity. We affirm the district court.

## A.

"Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) (internal quotation marks and citation omitted). Government officials are entitled to qualified immunity unless "(1) the allegations underlying the claim,

22

if true, substantiate the violation of a federal statutory or constitutional right; and (2) this violation was of a clearly established' right 'of which a reasonable person would have known." *Id.* (internal quotation marks and citation omitted).

The district court held that the no-trespass ban did not involve a constitutional violation that was clearly established. On the contrary, Davison's "concerning behavior extended over an extended period of time and the no-trespass letters were issued under circumstances long recognized as sufficient to impose such a sanction, including multiple levels of review and input of legal counsel." J.A. 3,810. Thus, "[n]o person in Defendants' position would have reasonably thought that he or she was engaged in conduct that violated the law, clearly established or otherwise." J.A. 3,810.

The district court correctly relied on *Lovern v. Edwards*, 190 F.3d 648 (4th Cir. 1999) to support its holding. In *Lovern*, the Fourth Circuit considered the constitutionality of a ban barring Lovern, a non-custodial father, from entering school property. The plaintiff began contacting school officials several times about his son's basketball coach and eventually confronted the coach in person at a school basketball practice for 25 minutes. *Id.* at 650. The school principal wrote Lovern a letter stating that his children's mother, the custodial parent, had requested notice and an opportunity to attend any school discussions about her children, and thus, any discussions by Lovern must be scheduled in advance. *Id.* at 651-52. The letter also stated that Lovern was barred from "High School property during school hours without [the principal's] express consent and authorization except to attend scheduled activities open to the public." *Id.* at 651 n.3. After receiving the letter, Lovern proceeded for months to contact school officials, attend county school

23

board meetings, and accuse school officials of various illegalities, corruption, and cover-ups. *Id.* at 650-51. Lovern was then banned from all county school property and offices because of his "continued pattern of verbal abuse and threatening behavior towards school officials, including staff and School Board members." *Id.* at 652 n.7. The district court dismissed the case for lack of subject-matter jurisdiction, concluding that the plaintiff had failed to state a substantial federal claim. *Id.* at 654-55. We affirmed, emphasizing that "[t]he right to communicate is not limitless," particularly where the plaintiff has engaged in a "continuing pattern of verbal abuse and threatening behavior towards school officials." *Id.* at 656. We thus upheld the ban because the plaintiff's constitutional rights were not "'directly and sharply' implicated by . . . [the] prohibition against him." *Id.* (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). As we explained, "school officials . . . have the authority and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property." 190 F.3d at 655; *see also Cole v. Buchanan Cnty. Sch. Bd.*, 328 F. App'x 204, 210-12 (4th. Cir. 2009) (overturning district court's denial of a school board's qualified immunity for a decision to ban plaintiff from all school grounds based on the "broad discretion" afforded to schools and school boards to "ensure the proper functioning of the educational system.").

Other circuits have relied on *Lovern* to uphold bans on people entering school property. For example, in *Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, the Third Circuit upheld a school board issuing a permanent ban against a plaintiff attending school board meetings on qualified immunity grounds, writing "the *Lovern* court's guidance on the scope of the 'right to communicate' on school property could plausibly

24

suggest to a reasonable official that the *permanent* ban at issue here would pass constitutional muster." 877 F.3d 136, 144 (3d Cir. 2017) (emphasis added). The court reasoned: "Even assuming there is a protected interest in participating in school board meetings despite engaging in a pattern of threatening and disruptive behavior, we cannot fault the individual Board officials for having failed to recognize that right as clearly established, particularly in light of the *Lovern* decision and the absence of contrary authority from the Supreme Court . . . ." *Id.*; *see also Johnson v. Perry*, 859 F.3d 156, 175 (2d Cir. 2017) (school officials are entitled to qualified immunity for banning a plaintiff from school property because parents have no "general and unlimited First Amendment right of access to school property"); *Jackson v. McCurry*, 762 F. App'x 919, 929 (11th Cir. 2019) (same).

*Lovern* establishes the constitutionality of no-trespass bans against parents attempting to enter school grounds. Given the similarities to *Lovern*, a reasonable official could conclude that the no-trespass ban in this case was constitutional. Thus, Defendants have qualified immunity on the damages claims against them in their individual capacities for counts 4 and 5, and we affirm the district court.

B.

Davison also seeks prospective injunctive relief in order to engage in similar activity criticizing the LCSB. Specifically, Davison asks this Court to invalidate provisions of LCPS Policy 6310 that impose a blanket ban on any individual given a no-trespass letter from visiting any LCPS property, regardless of the basis of or the specific restrictions

25

within the letter. Instead, he asks that the Court direct LCPS to narrowly tailor any future no-trespass ban to all limited public fora, such as during the school's after-hours setting.

"The purpose of an injunction is to prevent future violations," and the party seeking such relief "must satisfy the court that [prospective, injunctive] relief is needed." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). Injunctive relief is simply not "needed" where no-trespass bans are constitutional—an injunction here would not prevent any future constitutional violations.

VII.

Finally, Davison challenges LCPS Policy 6310 under the procedural due process clause of the Fourteenth Amendment and requests injunctive relief against the use of LCPS Policy 6310.

A.

Since the monetary damages claim in this count against the LCSB is denied, Davison only asks for injunctive relief against the use of LCPS Policy 6130 on this count. Davison alleges that Defendants "violated [his] Fourteenth Amendment Rights to procedural due process when they deprived him of constitutionally protected fundamental liberty interests without providing notice or a meaningful opportunity to be heard prior to the deprivation." JA 3,800. Davison asserts that his liberty interests include the right to direct his children's education, the right to enter school property, and the right of free speech on school property without fear of retaliation. JA 3,800. Davison also contends that he was deprived of procedural due process with respect to the suspension of his right

26

to post messages on Defendants' "public figure" Facebook pages.

Procedural due process claimants must show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Shirvinksi v. U.S. Coast Guard*, 673 F.3d 308, 314 (4th Cir. 2012) (citation omitted).

Regarding the no-trespass claim, the district court rightly held that this case fell into a "rare and extraordinary" circumstance when a post-deprivation remedy can satisfy due process. JA 3802. In *Goss v. Lopez*, the Supreme Court held that "[s]tudents whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school" without a pre-deprivation hearing. 419 U.S. 565, 582 (1975). The district court concluded as a matter of law that, even if Davison asserted a cognizable liberty interest, "Davison clearly presented an ongoing threat of disrupting the educational process" and "thus an adequate post-deprivation remedy satisfied any constitutionally required due process." JA 3,802.

We agree with the district court that the post-deprivation remedies provided in this case satisfy due process. As the district court recognized, Davison posed an ongoing threat of disruption to the educational process. Davison also had a number of post-deprivation remedies available to him, including several levels of administrative review, as well as state court review pursuant to Va. Code § 22.1-87. Davison had opportunities to discuss the no-trespass ban with Defendants, which he did in the administrative appeal, and he retained the ability to come to the school, provided that he had consent from Stephens or her designee. Thus, under the facts of this case, the post-deprivation remedies available

27

satisfied any required due process.

Thus, we affirm the district court's conclusion that Davison was not deprived of procedural due process.

## B.

Davison claims he was also denied procedural due process due to social media bans, stating he is entitled to monetary damages and injunctive relief. Davison appears to seek injunctive relief and monetary damages against the LCSB, and injunctive relief against Stephens, Morse, and Sheridan for count 6. *See* Op. Br. at 12. He does not clarify which defendants are liable for the no-trespass ban and which are for the social media ban. All claims against the LCSB are dismissed due to res judicata. Regarding the individual defendants, the district court only discussed Morse's social media ban. Since Morse has now unblocked Davison on social media, at most, Davison is seeking is prospective injunctive relief. Davison has not briefed why he needs a prospective injunction against Morse in particular. Though he seems to want injunctive relief regarding LCPS's social media policies, LCPS has never been a defendant in this action. Thus, there was no error committed by the district court and we affirm.

## VIII.

For the above reasons, the district court's grant of Defendants' Motion to Dismiss and Motion for Summary Judgment and denial of Davison's Partial Motion for Summary Judgment is

*AFFIRMED.*