**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 24-2182**

───────────────

ABBIE PLATT; ANNE MILLER; CARRI MICHON; JESSICA SMITH; SUZANNE SATTERFIELD,

       Plaintiffs - Appellants,

v.

MELINDA MANSFIELD, individually and in her official capacity as Chairwoman of the Loudoun County School Board; LOUDOUN COUNTY SCHOOL BOARD,

       Defendants - Appellees.

------------------------------

COMMONWEALTH OF VIRGINIA,

       Amicus Supporting Appellant.

───────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Michael Stefan Nachmanoff, District Judge.  (1:24-cv-01873-MSN-IDD)

───────────────

Argued:  September 11, 2025                    Decided:  December 22, 2025

───────────────

Before KING, WYNN, and QUATTLEBAUM, Circuit Judges.

───────────────

Affirmed by published opinion.  Judge Wynn wrote the opinion, in which Judge King joined. Judge Quattlebaum wrote a separate opinion concurring in part and dissenting in part.

**ARGUED:** Rachael C.T. Wyrick, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, for Appellants. Heather Kathleen Bardot, MCGAVIN, BOYCE, BARDOT, THORSEN & KATZ, P.C., Fairfax, Virginia, for Appellees. Frederick William Eberstadt, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Curiae. **ON BRIEF:** Andrew Block, Ian Prior, AMERICA FIRST LEGAL FOUNDATION, Washington, D.C.; Thomas R. McCarthy, Cody Ray Milner, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, for Appellants. Jason S. Miyares, Attorney General, Erika L. Maley, Solicitor General, Kevin M. Gallagher, Principal Deputy Solicitor General, Brendan Chestnut, Deputy Solicitor General, for Amicus Curiae.

2

WYNN, Circuit Judge:

In a limited public forum, the government may restrict speech so long as the limits are reasonable in light of the forum's purpose and not based on viewpoint. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001). Under its Policy 2520 ("the Policy"), the Loudoun County School Board prohibits speakers from targeting, criticizing, or attacking individual students during the public-comment periods of its public meetings, requiring that such concerns instead be directed to appropriate school officials.

Plaintiffs sued after they were interrupted pursuant to the Policy at a public meeting last year. They do not dispute that the Policy is facially a reasonable, viewpoint-neutral restriction consistent with the purpose of the forum. But they do contend that, as applied to them, the Policy discriminated against the particular viewpoint they sought to express. They also argue that the Policy is unconstitutionally vague.

We affirm the district court's denial of a preliminary injunction on the basis that Plaintiffs are unlikely to succeed on the merits of these claims.

I.

Throughout the school year, the School Board holds regular public meetings, which include a period for public comment. The public-comment period of the meetings is governed by the Policy. As relevant here, Section 2520(A)(3) of the Policy states that "[s]peaker comments that target, criticize, or attack individual students are not permitted during public meetings." J.A. 49.[1] Instead, "[s]peakers should communicate those concerns

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

3

privately to the school principal or an appropriate school official." *Id.*

On October 8, 2024, the School Board held a public meeting. Plaintiffs aver that they attended the meeting "to discuss news reports about the School Board's decision to reinstate a student who was arrested for threatening to kill a classmate and carrying a stolen firearm" and who had "ties to the transnational gang MS-13."[2] J.A. 11–12, 19 (complaint); *see* J.A. 53–61 (news reports); J.A. 65–87 (Plaintiffs' affidavits).

The public meeting covered a number of agenda items, spanning more than two hours, before the public-comment period commenced. Immediately before opening the public-comment period, the School Board's chair, Melinda Mansfield, reviewed applicable procedures, including referring to the Policy and quoting its relevant language: that speakers could not "target, criticize, or attack individual students . . . during public comment." LCPS-TV, *10-08-2024 2nd Tuesday School Board Meeting*, at 2:18:00–2:18:08 (Vimeo, Oct. 8, 2024) [hereinafter Oct. 8 Meeting at __], https://vimeo.com/1017767350 [https://perma.cc/J6D6-RSQJ];[3] *cf. id.* at 2:18:32–2:18:40 (referring to "Policy 2520" when discussing another applicable rule).

---

[2] To be more precise, the news reports provided to us in the record do not state that the student was arrested for threatening to kill a classmate, but rather that he was arrested related to the firearm and that police interviewed a juvenile who "told them that the boy also threatened to shoot a fellow" student. J.A. 54.

[3] The parties agree that the videos available on the "BoardDocs" website represent accurate recordings of the meetings discussed in this opinion. *Loudoun County Public Schools*, BoardDocs, https://go.boarddocs.com/vsba/loudoun/Board.nsf/Public [https://perma.cc/4BWH-KAEU] (last visited Sept. 19, 2025). To access a particular meeting's video, click "Meetings," navigate to the meeting by date, and then click "Watch Video." For ease of citation, we have cited the Vimeo links provided for each recording. These are accessible from the "Watch Video" page by clicking the three vertical dots, clicking "Share," and clicking the resulting Vimeo link.

Fifteen individuals, including three of the Plaintiffs, spoke during the public-comment period. Because Plaintiffs' comments and Mansfield's responses to them are at the heart of this case, we reproduce them in full.

Anne Miller was the eighth commenter overall and the first Plaintiff to speak. She stated,

> Good evening. Unfortunately, once again, Loudoun County School System continues to betray the trust of students and parents. The actions of this administrative apparatus tell us that it does not have the best interests of our children at heart. Three years ago this week a child in the School System's care was sexually assaulted by a student who had been reassigned to her school after sexually assaulting another [Loudoun County Public School] student five months earlier. We are aware of the unscrupulous coverup by the School System that betrayed the trust of parents. So, here we are again, with the reality that this School System continues to play Russian roulette daily with our children with their heads buried in the sand bowing down to the ever-mighty policies and procedures of a heartless, soulless administrative system machine. How many ticking time bombs are there, like the reassignment of yet another student who poses a significant threat to the safety of students—a student with violent gang affiliations who was arrested for—

*Id.* 2:28:17–2:29:12. At that point, Mansfield interrupted Miller to state,

> I would ask that you please maintain the civility and decorum of the respect for the functioning of the Board and refrain from comments on an individual student that could violate applicable confidentiality requirements. Personally identifiable information is any information that a reasonable person can link together and pinpoint individual students. And it's not only restricted to students' names. So, the Board is requesting that you please refrain from talking about a student without parent consent to discuss circumstances. Thank you. You may resume.

*Id.* 2:29:17–2:29:54. Miller concluded, "So, under the Constitution, under the color of law, you are culpable if you're willingly—which every single one of you are willfully doing—subjecting children in a situation that may result in injury or death. You may be imprisoned

5

or fined." *Id.* 2:30:14–2:30:35.

Next, several other individuals made comments on other topics. Two were cut off when their allotted time for commenting ended. *See id.* 2:31:59–2:32:02; 2:33:24–2:33:27. Another would-be commenter, who had been skipped because she was absent when her name was called, also asked to be allowed to speak. Mansfield denied her request, telling her that the School Board needed to abide by its rules. *See id.* 2:33:32–2:34:16.

A few minutes later, Plaintiff Carri Michon spoke, stating,

> The safety of our children is paramount. Parents, citizens and supposedly [Loudoun County Public Schools] says that. You have modified school entrances to have vestibule double entry at the main doors. You require visitors to show an ID upon entering [Loudoun County Public Schools] facility [sic]. For crying out loud, you have a jersey wall out in front of this building. All of your show of perimeter security means nothing if within the walls, the children aren't safe. Knowing that recently a student was carrying a concealed weapon walking to school—thankfully he was arrested before getting on the school—

*Id.* 2:37:04–2:37:35. Mansfield interrupted her, stating, "Again, I think Ms. Michon that you were here when we made a request of the last public speaker to please refrain from disclosing personal identifiable information about a student." *Id.* 2:37:38–2:37:51. Over protests from an unidentified individual that the information came from the news, Mansfield stated, "I am therefore asking you to please redirect your comment. If you continue to discuss a particular student's circumstances disclosing personally identifiable information about a student, the Board will be compelled to conclude public comment . . . for the evening. Thank you." *Id.* 2:37:55–2:38:15.

Before Michon began speaking again, Mansfield reiterated, "I just am reminding you again just to redirect your public comment away from a student, please." *Id.* 2:38:42–

6

2:38:48.

Michon concluded her comments without further interruption, stating:

My question is, what is being done to protect the children should anyone who so much as speaks of threatening with any kind of weapon gets [sic] inside our facilities. Do you have a reassignment policy? If the student is moved, does the new school know to be on high alert? Our children, our neighbors, our grandchildren, every single child and all the staff and teachers deserve to be protected. That's your job. Make sure you do it, because you can't go back. I have been at graveside services twice in the past two months, filled with grief. I don't wish that on anyone. Please think clearly on your policies.

*Id.* 2:38:49–2:39:28.

Plaintiff Abbie Platt spoke next. She stated,

I'm here today as a mother. And I appreciate all the comments of all these people that are here today to support safe storage [of firearms[4]]. It falls on flat ears, I'm afraid, because my daughter is terrified to go to school—a school where others threaten other children. And you can cut us off, and you can silence us all you want, but all this talk about . . . safe storage, which is common sense—I literally don't know a single person that does not support safe storage—but, where's the protection and the safety for our children who are in school with other children who have known threats, who have been arrested, and who are back in the school? And my daughter's terrified to go to school with him. When are we going to have that conversation?

*Id.* 2:39:42–2:40:36. Mansfield tried to interrupt to redirect Platt, over Platt's insistence that she was not providing personally identifiable information. *Id.* 2:40:36–2:40:40. Platt then stated, "This child has gone to great lengths to show everyone who he is." *Id.* 2:40:40–2:40:44. Mansfield labeled this "personally identifiable information," over protests from additional individuals, seemingly in the audience. *Id.* 2:40:44–2:40:55. Platt reiterated that

---

[4] The public meeting included a vote on a "gun safe storage resolution," which took place directly after the public-comment period. J.A. 237. A number of the public comments were related to this resolution.

7

she wanted her children to be safe and stated that she had "two children that have attended schools where this child has gone. That is terrifying." *Id.* 2:41:08–2:41:13. Mansfield then said that if such comments happened "one more time," the School Board would "have to conclude public comment for the evening. Thank you." *Id.* 2:41:13–2:41:19.

When the next speaker, who is not a party to this suit, got up and raised the same issue with some vehemence, Mansfield ended the public-comment period. *Id.* 2:41:39–2:42:55. This meant that five individuals who had signed up to make comments, including the final two Plaintiffs (Jessica Smith and Suzanne Satterfield), did not have a chance to speak.[5]

The following day, Mansfield and the superintendent of Loudoun County Public Schools issued a joint media release stating that they could not discuss individual students' circumstances with the media; that, at the October 8 meeting, some participants "sought to discuss what was reported in the media and discuss a specific student despite repeated requests from [Mansfield] not to do so"; and that Loudoun County Public Schools would "not support a forum where information about specific students is discussed publicly." J.A. 63. They went on to assert that they could not allow "students' safety, privacy, or well-being to be used as talking points at Board meetings or in the media to advance what appears to be a political agenda. Misinformation is on the rise, and school divisions like [Loudoun County's] must be vigilant in actively combating it." *Id.* They stated that it was their "responsibility to call out misinformation when allegations are incorrect,

_____

[5] Nevertheless, in this appeal, Plaintiffs do not dispute the School Board's prerogative to close the public-comment period to maintain order.

8

unsubstantiated, or deliberately used to create division within [the] community." *Id.*

Plaintiffs sued the School Board and Mansfield[6] on October 25, 2024, invoking 42 U.S.C. § 1983. As relevant here, they brought an as-applied free-speech challenge based on viewpoint discrimination and a facial void-for-vagueness challenge. Shortly thereafter, Plaintiffs moved for a temporary restraining order ("TRO") and a preliminary injunction. The district court held a TRO hearing on November 12, a few hours before another public meeting at which Plaintiffs wanted to speak. At the end of the hearing, the court denied the TRO but ordered briefing on the preliminary injunction to continue. It filed a short written TRO denial the same day. *See* J.A. 426–27.

The parties completed the preliminary-injunction briefing, but then jointly moved for the court to convert its ruling on the TRO request to one on the preliminary-injunction motion. The court granted the joint motion and, therefore, denied the preliminary injunction without issuing a further substantive opinion. Plaintiffs timely appealed. We have jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1).

## II.

"A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (cleaned up). "To obtain a preliminary injunction, a party must show: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the

---

[6] For simplicity, we will generally refer to the defendants collectively as "the School Board."

party's favor; and (4) an injunction is in the public interest." *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 492 (4th Cir. 2025).

Here, the parties dispute only the first factor: Plaintiffs' likelihood of success on the merits. To satisfy this factor, Plaintiffs "'need not establish a certainty of success,' but it must be 'clear that the plaintiff is likely to succeed at trial.'" *Jensen v. Md. Cannabis Admin.*, 151 F.4th 169, 175 (4th Cir. 2025) (quoting *Roe*, 947 F.3d at 219) (cleaned up).

"We review the decision to grant or deny a preliminary injunction for an abuse of discretion. Abuse of discretion is a deferential standard, and we may not reverse so long as the district court's account of the evidence is plausible in light of the record viewed in its entirety." *Roe*, 947 F.3d at 219 (cleaned up). Still, "[a] clear error in factual findings or a mistake of law is grounds for reversal." *Id.* (cleaned up).

## III.

Plaintiffs first contend that the School Board's actions subjected them to as-applied viewpoint discrimination. We agree with the district court that Plaintiffs have not established a sufficient likelihood of success on the merits of this claim to support a preliminary injunction.

"[T]he standards for determining whether the [defendants] unconstitutionally restricted [the plaintiff's] speech in a public forum depend on the nature of the forum. In the traditional public forum, which includes the streets, sidewalks, parks, and general meeting halls, speakers' rights are at their apex." *Steinburg v. Chesterfield Cnty. Plan. Comm'n*, 527 F.3d 377, 384 (4th Cir. 2008) (cleaned up). However, "[d]istinct from the traditional public forum is the 'limited public forum,' which governmental entities may

10

create in a specified location for a limited use." *Id.* at 384–85. In a limited public forum, the government "is not required to . . . allow persons to engage in every type of speech." *Id.* at 385 (quoting *Good News Club*, 533 U.S. at 106). But it "still must not discriminate against speech on the basis of viewpoint, and any restriction must be reasonable in light of the purpose served by the forum." *Id.* (cleaned up).

Plaintiffs agree that the public-comment periods of the School Board's public meetings constitute limited public fora. And they acknowledge that the School Board has adopted a Policy, which they do not challenge as facially discriminatory or unreasonable in light of the purpose served by the forum, that prohibits "comments that target, criticize, or attack individual students." J.A. 49; *cf. Steinburg*, 527 F.3d at 387 (upholding a "content-neutral policy against personal attacks" against a facial challenge); *Davison v. Rose*, 19 F.4th 626, 635–36 (4th Cir. 2021) (same). They contend, however, that the School Board's interruptions of their speech at the October 8, 2024, meeting constituted as-applied viewpoint discrimination—specifically, that the School Board wished to silence their "criticism of . . . its handling of a safety concern." Opening Br. at 18.

The district court, however, concluded at the TRO hearing that "speakers, including the plaintiffs in this lawsuit, were allowed to share viewpoints on safety or otherwise criticize the [S]chool [B]oard as long as they complied with the requirements of [the Policy] and didn't make reference to a specific student." J.A. 417. The court elaborated that "the record is clear, in listening to the video, that Defendant Mansfield interrupted speakers only when they began to refer to the particular student by reference to the newspaper article or to the criminal case or to the alleged gang affiliation, and that those

11

interruptions did comply with" the Policy. *Id.* In other words, "the evidence is clear it's only when the plaintiffs veered into targeting a specific student that they were interrupted." J.A. 418; *accord* J.A. 427 (court's written opinion, stating that "[t]he evidence is clear that Plaintiffs were interrupted only after their comments targeted a specific student in direct violation of [the] Policy"). The court also noted that the School Board interrupted other speakers for violating additional policies, such as by cutting speakers off when they exceeded their allotted time. Plaintiffs have not even attempted to argue that these conclusions were clear error, and we see none. To the contrary, the record strongly supports the district court's conclusions.

The video of the public-comment period from the October 8 meeting shows that speakers, including Plaintiffs and another commenter who spoke on a different issue, *see* Oct. 8 Meeting at 2:32:22–2:33:26, were allowed to make numerous comments critical of the School Board and Loudoun County Public Schools. Among Plaintiffs' criticisms were allegations that the School Board was "betray[ing] the trust of students and parents"; "[did] not have the best interests of [Plaintiffs'] children at heart"; had engaged in an "unscrupulous cover up" regarding multiple sexual assaults; was "play[ing] Russian roulette daily with [Plaintiffs'] children"; had "their heads buried in the sand"; was "willfully . . . subjecting children [to] a situation that may result in injury or death"; could "be imprisoned or fined"; was engaging in a "show of perimeter security" that "mean[t] nothing if within the walls, the children [were]n't safe"; and was permitting a situation where gun-safety policies "f[ell] on flat ears" because children were "terrified to go to school . . . where others threaten other children." *Id.* at 2:28:21–2:28:23, 2:28:27–2:28:29,

12

2:28:33–2:28:44, 2:28:50–2:28:54, 2:30:24–2:30:35, 2:37:24–2:37:29, 2:39:50–2:40:01.

Further, the School Board has made clear that Plaintiffs could state that the School Board was failing its students by, as a general matter, allowing those with established gang affiliations who carry guns to continue to attend its schools. *See* Oral Arg. at 28:00–28:54, https://www.ca4.uscourts.gov/OAarchive/mp3/24-2182-20250911.mp3. Indeed, Plaintiff Michon made comments along those lines without interruption during the October 8 meeting. Oct. 8 Meeting at 2:38:49–2:39:28 ("My question is, what is being done to protect the children should anyone who so much as speaks of threatening with any kind of weapon gets [sic] inside our facilities. Do you have a reassignment policy? If the student is moved, does the new school know to be on high alert? Our children, our neighbors, our grandchildren, every single child and all the staff and teachers deserve to be protected. That's your job. Make sure you do it, because you can't go back. . . . Please think clearly on your policies.").

Consistent with the Policy, however, Plaintiffs were *not* allowed to target, criticize, or attack an individual student. Thus, they were interrupted when they made the following comments:

- "How many ticking time bombs are there, like the reassignment of *yet another student who poses a significant threat to the safety of students—a student with violent gang affiliations who was arrested for—*"

- "Knowing that recently *a student was carrying a concealed weapon walking to school—thankfully he was arrested before getting on the school—*"

- "[W]here's the protection and the safety for our children who are in school with other children who have known threats, who have been arrested, and who are back in the school? And my daughter's *terrified to go to school with him.*"

13

- "*This child* has gone to great lengths *to show everyone who he is*."

- "I have two children that have attended schools where *this child* has gone. *That is terrifying*."

*Id.* at 2:29:00–2:29:12, 2:37:30–2:37:35, 2:40:16–2:40:36, 2:40:40–2:40:44, 2:41:08–2:41:13 (emphasis added).

We agree with the district court's commonsense conclusion that allusions to a particular student's "violent gang affiliations," arrests, threats to others, and possession of weapons on the way to school constitute criticisms of that student—regardless of whether those criticisms were valid, and regardless of whether they were ultimately directed at the School Board's handling of the situation.

To put a finer point on it, the question before us is not whether Plaintiffs had a reasonable concern to express. Nor are we confronted with the question of whether the School Board could stifle Plaintiffs' speech on this topic in *any* venue—it obviously could not. Rather, the question is whether the School Board violated Plaintiffs' constitutional rights by applying a facially constitutional policy to prevent them from making these particular statements in this specific, limited forum. It did not. Where a speaker is interrupted in a limited public forum for violating a facially constitutional speech policy, there is no as-applied First Amendment violation unless the defendant applies the policy in a discriminatory way. *See Davison*, 19 F.4th at 636.

Seeking to avoid this conclusion, Plaintiffs argue that the School Board's reliance on the Policy is a mere post-hoc rationalization because Mansfield did not explicitly cite the Policy when she interrupted them or in her statement released the next day. They also

14

contend that the School Board has not invoked the Policy to interrupt other individuals making similar comments, thus demonstrating discrimination against Plaintiffs' particular viewpoint. We address, and reject, each argument in turn.

A.

Regarding the import of post-hoc rationalization, we are guided by the First Circuit's holding that "statements by government officials on the reasons for [a decision to exclude speech] can indicate an improper motive." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004). And likewise, the D.C. Circuit has held that, in particular, "post-hoc rationalization[s]" for government action can provide "relevant" evidence: "if the Government proffers one reason when" taking a speech-limiting action "but another when it later defends" that action, "then that in itself is evidence of pretext." *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 366 (D.C. Cir. 2018). Plaintiffs contend that such pretext is evident here because Mansfield did not explicitly refer to the Policy when interrupting them at the October 8 meeting or in the media statement she issued the next day, instead giving other reasons for shutting down their speech. Based on the record before us and our deferential standard of review, however, we disagree.

Though the district court did not explicitly address this issue,[7] by concluding that

---

[7] We think it can be forgiven for that, given the time pressure associated with its ruling. Plaintiffs moved for a TRO on November 3, 2024, seeking a TRO allowing them to speak freely at a public meeting on the evening of November 12. The district court held a TRO hearing on the morning of November 12 and thus needed to issue its TRO ruling that day. It did not render a more comprehensive preliminary-injunction opinion because the parties jointly moved to convert the TRO ruling into a preliminary-injunction ruling.

15

the School Board appropriately relied on the Policy when it interrupted Plaintiffs, it necessarily rejected Plaintiffs' argument that that reliance was a mere fig leaf conjured up after the fact to hide discriminatory motives. *See* J.A. 417–18, 427. We see no clear error in that conclusion. *See Williams v. Albemarle City Bd. of Ed.*, 508 F.2d 1242, 1244 (4th Cir. 1974) (evaluating "whether [an] implicit finding was clearly erroneous"); *Skyline Tower Painting, Inc. v. Goldberg*, 148 F.4th 209, 225 (4th Cir. 2025) (same).

Plaintiffs are correct that Mansfield did not explicitly refer to the Policy when interrupting them at the October 8 meeting or in the media statement she issued the next day. While she referred to "Policy 2520" and quoted the relevant portion of the Policy just before the public-comment period began, when she interrupted Plaintiffs, she instead referred to "civility and decorum," "applicable confidentiality requirements," and "personal[ly] identifiable information about a student," and asked one Plaintiff "to redirect [her] public comment away from a student." Oct. 8 Meeting at 2:18:00–2:18:08, 2:18:32–2:18:40, 2:29:20–2:29:29, 2:37:48–2:37:51, 2:38:45–2:38:48. In the next day's written media statement, Mansfield and the school superintendent asserted that Loudoun County Public Schools would "not support a forum where information about specific students is discussed publicly" because they could not "allow [their] students' safety, privacy, or well-being to be used as talking points at Board meetings or in the media to advance what appears to be a political agenda"; that "[m]isinformation is on the rise, and school divisions like" Loudoun County's "must be vigilant in actively combating it"; and that because "allegations are not facts," "[a]llowing unverified information to spread in a public forum, particularly one offered by the School Board, would be irresponsible." J.A. 63. The School

16

Board did not explicitly cite the Policy's prohibition against "comments that target, criticize, or attack individual students" in reference to its interruptions of Plaintiffs at the October 8 meeting until the next public meeting two weeks later.

It certainly would have been clearer if Mansfield had directly cited the Policy when interrupting Plaintiffs. But she quoted the relevant language before the public-comment period began, adding necessary context to her statements, which were clearly gesturing toward the prohibition on making negative comments about an individual student. At this stage of the case, we decline to flyspeck Mansfield's statements for whether she cited chapter and verse in trying to keep Plaintiffs within the bounds of the Policy. Her statements were made in the heat of the moment while managing a public meeting at which she also had to cut off other speakers for exceeding their allotted time and preclude another individual from speaking because she was not present when her turn was announced. "Exercising this type of discretion is precisely what we have observed that presiding officers may do." *Steinburg*, 527 F.3d at 390 (citing *Collinson v. Gott*, 895 F.2d 994, 1000 (4th Cir. 1990) (Phillips, J., concurring)).

Notably, even attorneys, including the School Board's counsel and the district court judge, have slipped up and referred to "comments" on, "reference[s] to," or "talk[ing] about" individual students, rather than "attacks" or "criticisms." *E.g.*, J.A. 213 (School Board's counsel); Oral Arg. at 35:21–35:43 (same); J.A. 417 (district court). This strikes us as an easy omission to make. Once the context has been established that one is talking about *critical* comments, it is understandable that one might drop the adjective while intending the same meaning. A full review of the record makes abundantly clear that both

17

the School Board's counsel and the district court understand the Policy to prohibit only the types of comments that it specifically names: those that target, criticize, or attack individual students. *E.g.*, J.A. 186, 192–95, 200–01 (School Board's response to request for TRO); J.A. 390–93 (district court's questions for Plaintiffs at TRO hearing, focusing on the Policy's language); J.A. 406–13 (School Board's arguments at TRO hearing); J.A. 417–18 (district court's conclusions at TRO hearing); J.A. 427 (district court's written decision). Similarly, Mansfield's invocation of the Policy before Plaintiffs made their comments provides necessary context for her interruptions of them.

As for the media statement Mansfield released the next day, at this preliminary stage of the proceedings, we see no clear error in the district court's implicit rejection of Plaintiffs' argument that the media statement demonstrates that Mansfield's later, explicit invocation of the Policy was a mere post-hoc rationalization. While the media statement again did not directly quote or cite the Policy's prohibition against "comments that target, criticize, or attack individual students," its references to concerns about protecting students from invasions of privacy and false allegations can reasonably be understood to point to the considerations underlying that rule.

We therefore see no abuse of discretion in the district court's implicit rejection of Plaintiffs' arguments based on alleged post-hoc rationalizations.

B.

Plaintiffs also contend that the School Board's treatment of other commenters at various earlier public meetings demonstrates that the School Board was discriminating

18

against Plaintiffs' viewpoint when it interrupted them. Again, we are not persuaded.[8]

Pointing to differential treatment of others who engaged in similar conduct can support a viewpoint-discrimination claim. *E.g.*, *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 624 (4th Cir. 2002) ("[W]here an evaluation of a given restriction and the surrounding circumstances indicates that one or more speakers are favored over others, and further that the basis for the restriction is in fact the message the disfavored speaker seeks to convey, the restriction violates the First Amendment."); *cf. Steinburg*, 527 F.3d at 390 (rejecting viewpoint-discrimination claim based on comparators because the plaintiff "was treated no differently" than the other speakers). But the comparators Plaintiffs raised before the district court are irrelevant because they at most merely *mentioned* a student without *targeting, criticizing, or attacking* the student.[9]

---

[8] In a footnote in their opening brief, Plaintiffs cite two statements made by speakers at the public meeting on November 12, 2024, *after* the district court issued its ruling on the TRO earlier that day. Opening Br. at 12 n.6. But a party forfeits an argument "by taking only a passing shot at the issue in a footnote." *Parkway 1046, LLC v. U. S. Home Corp.*, 961 F.3d 301, 309 n.4 (4th Cir. 2020) (internal quotation marks omitted). Moreover, Plaintiffs did not cite these would-be comparators in their preliminary-injunction reply brief, which they filed in the district court nearly a week after the November 12 meeting. We decline to review this new evidence in the first instance. *See Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 216 (4th Cir. 2024) ("This evidence was not before the district court, so it could not have clearly erred by failing to consider it.").

[9] *See* J.A. 29, 399–400 (citing comment at a January 30, 2024, public meeting that referred to a student who "tragically took his own life"; comment at that same public meeting that referred to a medical emergency during that school year "that required EMS in our cafeteria"; and comment at a June 25, 2024, public meeting that referred to students "wearing stoles bearing the Palestinian flag"); LCPS-TV, *06-25-2024 4th Tuesday School Board Meeting*, at 2:49:36–2:50:37 (Vimeo, June 26, 2024), https://vimeo.com/968760770 [https://perma.cc/82TG-NMKD] (recording of June 25, 2024, meeting, making clear that

Plaintiffs raise these comparators because they contend that the School Board's position is that merely *mentioning* a student violates the Policy. They also fault the district court for stating imprecisely during the TRO hearing that "there's really no evidence of prior student-specific public comments that were allowed and not interrupted by the [School B]oard." J.A. 416. But as discussed—and for reasons we think understandable—while the School Board and even the district court have at times been imprecise in the language they use to describe the Policy, everyone agrees that the Policy means what it says: that comments must target, criticize, or attack an individual student to constitute a violation. *E.g.*, J.A. 417–18 (district court stating, moments later, that Plaintiffs were only interrupted when they targeted, criticized, or attacked an individual student).

The cited comparators thus actually demonstrate that the School Board has been *consistent* in its application of the Policy: The Policy does not prevent commenters from mentioning individual students, so long as the comments do not target, criticize, or attack an individual student.[10]

Plaintiffs also argue that "the record shows that all sorts of other speakers who were not attempting to criticize the School Board for ongoing safety concerns were permitted to

the speaker was not criticizing the students or graduates, but rather was criticizing a School Board representative's treatment of them and requesting an apology).

[10] For the first time in their reply brief, Plaintiffs argue that the School Board's implementation of the policy was inconsistent based on Plaintiff Miller's own references to sexual assaults committed by a student, which the School Board did not interrupt. Aside from being forfeited by being raised for the first time in reply, *see Parkway 1046*, 961 F.3d at 309 n.4, this argument fails to grapple with the School Board's explanation that the individuals involved in that incident were no longer students at the time of Miller's statement and that comments do not violate the Policy if they criticize former, rather than current, students. J.A. 374; *see* Response Br. at 6 n.4, 15–16, 19.

directly and indirectly reference specific students without interruption or admonishment."[11] Opening Br. at 26. But at least two of their cited comparators *were* raising "ongoing safety concerns," related to mental health and medical emergencies. *See supra* nn.9, 11. And, as noted, Plaintiffs themselves were allowed to raise such concerns so long as they did not target, criticize, or attack an individual student.

We therefore affirm the district court's conclusion that Plaintiffs have not shown a sufficient likelihood of success on the merits of their viewpoint-discrimination claim to support a preliminary injunction.

IV.

Separately from their viewpoint-discrimination claim, Plaintiffs also argue that they are likely to succeed on the merits of their claim that the Policy prohibiting "comments that target, criticize, or attack individual students" is unconstitutionally vague. Again, we disagree.

Under the Due Process Clause, individuals must receive "fair notice of conduct that is forbidden or required." *Lumumba v. Kiser*, 116 F.4th 269, 284 (4th Cir. 2024) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)), *cert. denied*, 145 S. Ct. 1189 (2025). "To survive a vagueness challenge, a statute must give a person of ordinary

---

[11] The Commonwealth of Virginia, as Amicus, argues more broadly that "the Board allowed other statements referring to identifiable students—so long as they did not criticize the Board." Amicus Br. at 15. That is wrong. In each of the statements of comparators that Plaintiffs cited, the commentor was criticizing the School Board. *See* LCPS-TV, *01-30-2024 4th Tuesday School Board Meeting*, at 2:50:36–2:51:40, 3:06:52–3:07:53 (Vimeo, Jan. 30, 2024), https://vimeo.com/908090741 [https://perma.cc/82BT-MUV4] (providing context for both cited January 30, 2024, comments); *supra* n.9 (providing context for June 25, 2024, comments).

intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Hebb v. City of Asheville*, 145 F.4th 421, 440 (4th Cir. 2025) (quoting *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc)). "Less clarity is required in purely civil statutes [than in criminal ones] because the 'consequences of imprecision are qualitatively less severe.'" *Manning*, 930 F.3d at 272 (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)). At the same time, "'[w]hen speech is involved,' as it is here, 'rigorous adherence to th[e noted] requirements is necessary to ensure that ambiguity does not chill protected speech.'" *Hebb*, 145 F.4th at 440 (quoting *Fox Television Stations*, 567 U.S. at 253–54).

"But perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Id.* (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010)) (cleaned up). "While there is little doubt that imagination can conjure up hypothetical cases in which the meaning of terms will be in nice question, because we are condemned to the use of words, we can never expect mathematical certainty from our language." *Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 371 (4th Cir. 2012) (cleaned up) (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)).

Rather, "[a] litigant must make a high showing before we will strike down a regulation as void for vagueness. 'That some smidgen of ambiguity remains is no reason to find a statute unconstitutionally vague.'" *Lumumba*, 116 F.4th at 285 (quoting *Recht v. Morrisey*, 32 F.4th 398, 415 (4th Cir. 2022)). "Dictionary definitions and old-fashioned common sense facilitate the inquiry." *Wag More Dogs*, 680 F.3d at 371. Further, "[w]hen

22

the terms of a regulation are clear and not subject to attack for vagueness, the plaintiff bears a high burden to show that the standards used by officials enforcing the statute nevertheless give rise to a vagueness challenge." *Id.* at 372. At bottom, "[a] law is not void for vagueness so long as it '(1) establishes minimal guidelines to govern law enforcement, and (2) gives reasonable notice of the proscribed conduct.'" *Lumumba*, 116 F.4th at 285 (quoting *Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998)).

Applying these standards here, we conclude that Plaintiffs have not shown a sufficient likelihood of success on the merits of their argument that the Policy's use of the phrase "target, criticize, or attack" is unconstitutionally vague.[12]

Plaintiffs' argument is twofold. First, they argue that the challenged terms are "borderline vague and lack the specific and objective criteria necessary to guide enforcement" because they "collectively refer to speech that is abusive, antagonistic, or offensive," which "is wholly dependent on the subjective views of the official charged with enforcement." Opening Br. at 37. But second—and in seeming contradiction of their first argument—Plaintiffs argue that "[t]he terms 'target,' 'criticize,' and 'attack' are all common words with generally well-known definitions" and that "[a]n ordinary person exercising ordinary common sense who reads the prohibition against comments that 'target, criticize, or attack' would think that the provision bans exactly that: comments that 'target, criticize, or attack.'" *Id.* at 40–41. We agree with this latter argument—and that

---

[12] Plaintiffs' complaint alleges that other aspects of the Policy are vague, but they acknowledge that those issues are not before us in this appeal. We thus confine our discussion to the "target, criticize, or attack" language.

23

means the Policy is, by definition, not unconstitutionally vague.

Each of the challenged terms has a common, readily understandable meaning. Most relevant here, as Plaintiffs note, "criticize" can mean "to indicate the faults of (someone or something) in a disapproving way." *Id.* at 40 (quoting *Criticize*, *New Oxford American Dictionary*, at 410 (3d ed. 2010)); *accord Criticize*, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/criticize    [https://perma.cc/46LB-7GBA] (last visited Sept. 19, 2025) (defining "criticize" in part as "to find fault with" or "point out the faults of"). It is hard for us to see how Plaintiffs' comments in this case would not fall under that definition, as the district court noted. *See* J.A. 392–93. And "if [the challenged policy] clearly proscribes [the plaintiffs'] conduct"—including in the context of a speech restriction—they "cannot successfully challenge it as unconstitutionally vague." *Lumumba*, 116 F.4th at 285.

We also disagree with Plaintiffs' argument that these terms are too subjective to survive constitutional scrutiny. For one thing, Plaintiffs assert only that this alleged subjectivity makes them "*borderline* vague" and argue that "while most ordinary people exercising ordinary common sense might be able to agree on extreme cases where speech is clearly abusive or antagonistic, in harder cases what constitutes 'criticism' or an 'attack' is wholly dependent on the subjective views of the official charged with enforcement." Opening Br. at 37 (emphasis added). But "the mere fact that close cases can be envisioned" does not "render[] a statute vague." *United States v. Williams*, 553 U.S. 285, 305 (2008). A "smidgen of ambiguity" is not enough. *Recht*, 32 F.4th at 415.

Further, Plaintiffs seek to rely on two cases from other circuits that are inapposite.

24

In *Ison v. Madison Local School District Board of Education*, the Sixth Circuit struck down prohibitions on "abusive," "personally directed," and "antagonistic" speech—but not because they were vague. Rather, it concluded that those prohibitions facially discriminated on the basis of viewpoint. *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 894–95 (6th Cir. 2021). It nevertheless suggested that "a personal attack" might constitutionally be prohibited. *See id.* at 894 n.1. In *Moms for Liberty v. Brevard County Schools*, the Eleventh Circuit similarly found a ban on "abusive" speech to be unconstitutional viewpoint discrimination, while concluding that a ban on "personally directed" speech was not reasonable in light of the meetings' purpose. *Moms for Liberty v. Brevard Cnty. Schs.*, 118 F.4th 1324, 1334–35 (11th Cir. 2024). Those are First Amendment holdings based on viewpoint discrimination and reasonableness, not void-for-vagueness holdings.

Finally, Plaintiffs contend that this Court should reverse the district court's denial of a preliminary injunction because its vagueness analysis was based on a misunderstanding of the law: the court concluded that it was bound on the vagueness question by two Fourth Circuit decisions that (like the relevant portions of *Ison* and *Moms for Liberty* on which Plaintiffs rely) did not involve vagueness at all, but instead were viewpoint discrimination or reasonableness holdings. Opening Br. at 34–36; *see* J.A. 417, 427 (first citing *Davison*, 19 F.4th at 635–36; and then citing *Steinburg*, 527 F.3d at 387).

We disagree that reversal is necessary here. Certainly, we can conclude that a district court abused its discretion in denying a preliminary injunction if it "misapprehend[ed] the law." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (cleaned up). But, at the same time, "[w]e are not limited to evaluation of the grounds

offered by the district court to support its [preliminary-injunction] decision, and we may affirm on any grounds apparent from the record." *Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 277 (4th Cir. 2025) (cleaned up) (affirming grant of preliminary injunction on alternative grounds). Because Plaintiffs' vagueness argument lacks merit regardless of any error in the district court's analysis, judicial economy favors affirmance.

V.

To be sure, there can be little doubt that Plaintiffs' remarks touched upon matters of genuine import. Their statements raised serious concerns about a particular student, and such concerns are not lightly to be dismissed. Yet the question before us is not whether the subject is important, but whether the forum chosen for its airing was a proper one. The School Board's meeting constituted a limited public forum, and in such a forum the government may impose reasonable restrictions on speech, provided they are both viewpoint-neutral and consistent with the forum's purpose.

Our holding today is thus a narrow one. It addresses speech only in a limited public forum, and nowhere else. Beyond that forum, Plaintiffs retain the full panoply of constitutional protections. They remain free to express their views regarding students or the School Board's policies through a wide array of channels—whether by speaking to the media, engaging in public protests, or reaching out privately to school officials. What the Policy forecloses is not speech in general, but a discrete category of speech: commentary at School Board meetings that targets, criticizes, or attacks individual students.

The First Amendment, it must be remembered, safeguards both the right of citizens to question government and the ability of government to maintain order in forums designed

26

for limited purposes. Here, in this preliminary posture, Plaintiffs have not carried the burden of showing a likelihood of success on the merits of their contention that the Policy trespasses upon those constitutional guarantees.

Accordingly, the judgment of the district court is affirmed.

*AFFIRMED*

QUATTLEBAUM, Circuit Judge, concurring in part and dissenting in part:

District courts have a tough job. With limited resources, they manage large dockets that present hard questions requiring prompt resolution. As the majority aptly recognizes, a district court's failure to expressly address a category of evidence, or the related argument, in announcing its decision does not demand that we conclude the district court erred. For even without express discussion, context can show that the district court adequately considered the evidence and argument. Applying that principle to this case, I agree with the majority that the record indicates the district court considered the evidence and argument presented by plaintiffs in support of their as-applied viewpoint discrimination claim. Also, while I would likely have decided things differently, I agree with the majority that the district court's as-applied decision was not an abuse of discretion.

But basing a decision on the wrong legal standard is a different matter. Because in rejecting the plaintiffs' void for vagueness claim, the district court believed two of our cases required a result that they do not require, I would vacate and remand that portion of the district court's order so that the district court could properly consider that claim under the appropriate legal standard in the first instance.

**I.**

The way I see plaintiffs' as-applied viewpoint discrimination claim, there are two issues for us to decide: First, did the district court consider plaintiffs' evidence and related arguments that the school board's shifting explanations—or post-hoc rationalizations—established likelihood of success on their viewpoint discrimination claim? And second, are plaintiffs likely to succeed on the merits of this claim?

28

## A.

I'll start with whether the district court considered plaintiffs' post-hoc rationalization evidence and arguments. As the majority explains, the district court did not describe how such evidence fit into its analysis. Despite that lack of explicit discussion, I agree that the record shows that the district court did consider plaintiffs' evidence and arguments.

For starters, the district court said it did. At the beginning of the hearing, the district court said, "I've received the briefing from the plaintiffs as well as the opposition filed by the defendants yesterday. I've reviewed all of the materials and had the opportunity to look at the links to the school board hearing on October 8 as well as the other school board hearings referenced in the complaint and in the motions." J.A. 381–82. Also, plaintiffs reiterated their arguments—including those about comparator evidence and post-hoc and inconsistent justifications—at the hearing. During the hearing, the court continuously engaged with counsel, probing the evidence plaintiffs claimed supported their position. And last, when the district court announced its decision, the district court again noted that it had considered the parties' briefing and exhibits, including the recordings of the School Board meetings, as well as the parties' arguments at the hearing.

Thus, while it may be an abuse of discretion to ignore a plaintiff's significant, unrebutted evidence, *see Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (en banc), the context here shows that did not happen. The fact that the district court did not address plaintiffs' evidence of post-hoc rationalizations does not change this. District courts are not required to mechanically check off each argument or

29

piece of evidence advanced by a party. *See Frazier v. Prince George's Cnty.*, 86 F.4th 537, 544 (4th Cir. 2023) ("Rule 52(a)(2)[] . . . does not require a tome that memorializes all factual minutiae or responds to every legal assertion [when a district court rules on a motion for a preliminary injunction].")*; see also Malbon v. Pa. Millers Mut. Ins. Co.*, 636 F.2d 936, 939 n.8 (4th Cir. 1980) ("It is, of course, not absolutely necessary, that a judge, in disposing of a motion, specifically recite or otherwise discuss each contention advanced by the parties."). And when a district court does not address a particular point, we should not default to the assumption that it ignored the argument. *See Malbon*, 636 F.2d at 939 n.8. I agree with the majority's adherence to this principle today. And I hope that we will consistently apply it in future cases.

**B.**

This brings me to the second issue—whether plaintiffs are likely to succeed on the merits of their as-applied viewpoint discrimination claim. While I ultimately agree with the majority that we should affirm the district court's decision on this claim, I get there by a different path.

As the majority explains, any restriction that a governing body places on speech in a limited public forum must be reasonable considering the forum's purpose and must not discriminate based on viewpoint. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001). If there is a viewpoint discrimination claim, the "principal inquiry" is whether the governing body restricted speech based on its agreement or disagreement with the message conveyed. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Even when a governing body justifies its decision to restrict speech by pointing to a facially

30

neutral policy, it may still have engaged in unlawful viewpoint discrimination if it applies the policy in a discriminatory manner and acts with an improper motive. *Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 864 (8th Cir. 2021); *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004). Courts must, therefore, consider whether "[t]he recitation of viewpoint-neutral grounds [is] a mere pretext for an invidious motive," and this is especially true when, as here, the restricted speech is critical of the very body imposing the restriction. *Ridley*, 390 F.3d at 86.

Also, because governing bodies, like the School Board, rarely admit that they are engaging in unlawful viewpoint discrimination, courts must turn to other evidence to determine whether the true reason for a speech restriction is based on viewpoint. *Id.* at 86–87; *see also Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 624 (4th Cir. 2002). This is precisely why plaintiffs' evidence of the School Board's shifting explanations or post-hoc rationalizations for its decision to restrict plaintiffs' speech is so important. *See Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*, 901 F.3d 356, 366 (D.C. Cir. 2018); *St. Michael's Media, Inc. v. Mayor & City Council of Balt.*, 566 F. Supp. 3d 327, 367 (D. Md. 2021), *aff'd,* 2021 WL 6502219 (4th Cir. Nov. 3, 2021).

I see plaintiffs' post-hoc rationalization evidence differently than the majority. That evidence makes clear that the School Board has had a hard time getting its story as to why it restricted plaintiffs' speech straight. The majority correctly states that, at the beginning of the public comment period at the October 8 meeting, Mansfield—the School Board Chair—gave the general and anticipatory warning that speakers should not target, criticize

31

or attack students during the public comment period under Policy 2520. Oct. 8 Meeting at 2:18:00–2:18:08.[1] Yet when plaintiffs gave their remarks, Mansfield admonished them for a different reason—for speaking on an individual student's "personally identifiable information." *E.g.*, Oct. 8 Meeting at 2:29:17–2:29:54. The majority chalks up this shift to a slip of the tongue. Perhaps. But if Mansfield truly intended to accuse plaintiffs of violating Policy 2520, wouldn't she have been able to recall the words of that Policy, or at least the gist of them, which she had just recited minutes earlier?

Even more concerning, the joint media release put out the next day—a written and presumably carefully crafted statement, rather than an off-the-cuff remark—gives yet another explanation that further deviates from the language of Policy 2520. Instead of saying anything about targeting, criticizing or attacking students, the media release suggests that Mansfield restricted plaintiffs' speech because they were engaged in spreading misinformation in furtherance of a political agenda. Once again forgiving the School Board's fluctuation, the majority believes that restricting "false allegations" is essentially the same as restricting comments that target, criticize or attack students. Maj. Op. at 18. But it is not. If the School Board can parse a speaker's comments, restricting those it found to be "false" and permitting those it found to be true, it would necessarily be restricting speech based on whether it agreed with the substance of that speech. That is a separate matter from whether that speech violated the Policy; it is also the very definition of unconstitutional viewpoint discrimination. *See Ward*, 491 U.S. at 791.

---

[1] The recordings of the School Board's meetings can be accessed online by following the instructions provided in footnote 3 of the majority opinion.

32

On its third try, the School Board finally settled on an explanation—that plaintiffs targeted, criticized or attacked a student in violation of Policy 2520. *See* Oct. 22 Meeting at 2:21:28–2:22:04. But that rationalization did not come until, at the earliest, two weeks after the School Board initially interrupted plaintiffs' speech and after it announced two other explanations. And the law does not require us to disregard the School Board's winding path to this final answer. To the contrary, the School Board's changing justifications are probative of whether it engaged in viewpoint discrimination. *See Am. Freedom Def. Initiative*, 901 F.3d at 366.

Even so, we review the district court's denial of a preliminary injunction for abuse of discretion. *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 210 (4th Cir. 2024). The district court found that plaintiffs targeted, criticized or attacked a student in violation of the Policy. And it found that there was evidence indicating that the School Board did not apply its Policy in a discriminatory manner. While the evidence of the School Board's shifting stories might have persuaded me otherwise, I recognize that plaintiffs face a high burden to show they are entitled to mandatory preliminary relief. *See id.* at 209 ("Mandatory preliminary injunctions are 'warranted only in the most extraordinary circumstances.'" (quoting *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994))). And because there was evidence in the record to support the district court's findings, I cannot

33

say that the district court abused its discretion. So, I agree with the majority that we should affirm this portion of the district court's decision.[2]

## II.

On the other hand, I disagree with the majority's decision regarding plaintiffs' void for vagueness claim. Like it did with plaintiffs' viewpoint discrimination claim, the district court denied preliminary relief on the vagueness claim upon finding plaintiffs had failed to demonstrate their likelihood of success on the merits. The district court reached this decision because it found it was "bound" by two of our previous cases—*Steinburg v. Chesterfield County Planning Commission*, 527 F.3d 377 (4th Cir. 2008), and *Davison v. Rose*, 19 F.4th 626 (4th Cir. 2021). J.A. 417–18, 427. However, as the majority seems to agree, neither of these cases were decided on vagueness grounds. *Steinburg*, 527 F.3d at 386–90; *Davison*, 19 F.4th at 634–36. Consequently, neither case controlled the district court's disposition of the issues at hand. *See e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377,

---

[2] I am also concerned with the majority's description of the viewpoint discrimination standard. At one point, the majority states that the issue in this case is whether the School Board applied its policy in a discriminatory manner. Maj. Op. at 14–15. I agree. But later, the majority states that "by concluding that the School Board appropriately relied on the Policy when it interrupted Plaintiffs, [the district court] necessarily rejected Plaintiffs' argument that that reliance was a mere fig leaf conjured up after the fact to hide discriminatory motives." Maj. Op. at 16. This language suggests that, because the district court found that the School Board was enforcing a facially neutral policy, the district court must have rejected plaintiffs' evidence of a post-hoc rationalization. But that does not necessarily follow. The question of whether plaintiffs violated the School Board's policy is distinct from whether the School Board engaged in viewpoint discrimination. After all, "[a] reasonable 'nondiscrimination policy that is viewpoint neutral on its face may still be unconstitutional if not applied uniformly.'" *Intervarsity Christian Fellowship*, 5 F.4th at 864 (quoting *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 803 (9th Cir. 2011)).

386 n.5 (1992) ("It is of course contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned."). Thus, the district court's decision that they required rejecting plaintiffs' void for vagueness claim is not correct. Additionally, and as the majority agrees, it is an abuse of discretion for a district court to rest its decision on a misapplication of law. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014).

Still, the majority looks past this error too. Rather than vacating the district court's order and remanding the case for the district court to apply the proper legal standard, the majority decides, in the first instance, that the Policy's prohibition against targeting, criticizing or attacking a student is not unconstitutionally vague. To the majority, because the Policy's prohibition of criticizing a student "clearly proscribes" plaintiffs' conduct, plaintiffs cannot successfully mount their vagueness challenge. Maj. Op. at 24 (quoting *Lumumba v. Kiser*, 116 F.4th 269, 285 (4th Cir. 2024)).

I don't think it's clear that Policy 2520 proscribed plaintiffs' speech. Recall that the policy says, "[s]peaker's comments that target, criticize, or attack individual students are not permitted." J.A. 49. To be sure, plaintiffs expressed anger over a student—who they said was in a gang and was arrested for carrying a gun—being assigned to a middle school. Yet, beyond mentioning the gang affiliation and weapons arrest, plaintiffs gave no identifying information for this student. For example, they did not mention the student's name or grade. It seems hard to "target, criticize, or attack" a student without more clearly identifying him.

35

In contrast, the primary object of plaintiffs' criticism was the School Board for its handling of safety concerns related to its decision to reassign this student. *See* Oct. 8 Meeting 2:28:45–2:29:12 ("So here we are again with the reality that this school system continues to play Russian roulette daily with our children, with their heads buried in the sand, bowing down to the ever-mighty policies and procedures of a heartless, soulless administrative system machine. How many ticking time bombs are there? Like the reassignment of yet another student who poses a significant threat to the safety of students, a student with violent gang affiliation who was arrested . . . ."); *id.* 2:37:23–2:37:33 ("All of your show of perimeter security means nothing if, within the walls, the children aren't safe. Knowing that recently a student was carrying a concealed weapon, walking to school . . . ."); *id.* 2:40:05–2:40:34 ("But where's the protection and the safety for our children who are in school with other children, who have known threats, who have been arrested and who are back in the school. And my daughter's terrified to go to school with him . . . ."). I acknowledge that these comments reflect a desire that their children not go to school with a gang member who carries guns to school. Even so, those feelings are secondary to their anger at the School Board for allowing it to happen. Does Policy 2520 proscribe speech that is not directed at a student, that does not identify a student, but that may incidentally and indirectly criticize a student? It might. But the language of Policy 2520 does not clearly answer that question.

What's more, at the next meeting, two weeks after the October 8 meeting, the School Board elaborated on its interpretation of the Policy. But rather than providing clarity, its

36

explanation creates more confusion. During the October 22 meeting, Mansfield explained that:

> The School Board welcomes you to share your concerns but asks that, to the extent you have prepared remarks that target, criticize or attack any individual students, you generalize such remarks to ensure compliance with board policy. For example, comments that target, criticize or attack "*a student*," or "*a student*" from *a* specific named school, or "*a student*" with any characteristics where the information, would personally identify that student to others in the school or broader LCPS community, would violate School Board policy. However, comments that discuss general concerns with *students* or at *schools* and do not target, criticize or attack an individual, identifiable student are permissible. While the media and our law enforcement are able to share information that relates to a personally identifiable student at their discretion—based on relevant student privacy laws and relevant School Board policy—targeting, criticizing or attacking individual students is *prohibited in this forum*.

Oct. 22 Meeting at 2:23:01–2:24:21. In other words, it doesn't violate the policy to say there *are* violent gang *members* in Loudoun County schools, but it does violate the policy to say there is *a* violent gang *member* in a Loudoun County school? This makes no sense. I don't see any meaningful difference between what the School Board says is okay and what it says is not. Certainly, the text of Policy 2520 would not give someone any indication that the former would be permitted and the latter disallowed.

To be clear, I do not offer my view on whether the words, "target," "criticize" or "attack" are unconstitutionally vague. The majority's analysis on the dictionary definitions of these words makes some good points. And I recognize that plaintiffs face a high burden to prove vagueness in the School Board's Policy. *See Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359, 372 (4th Cir. 2012). My point is this is a close call. So, I would vacate and remand for the district court to consider this issue under the appropriate legal

37

standard in the first instance. After all, we do our best work as a reviewing court. *See*

*Lovelace v. Lee*, 472 F.3d 174, 203 (4th Cir. 2006). For this reason, I respectfully dissent

from this portion of the majority's opinion.